UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CLIFFSTAR CORPORATION,                                    **REPORT AND**
                                                          **RECOMMENDATION**
                                Plaintiff,
                                                          09-CV-00690(A)(M)
v.

ALPINE FOODS, LLC and
JENSEN CRANBERRY BOGS, INC.,

                                Defendants.
_____

        This case has been referred to me by Hon. Richard J. Arcara for supervision of

pretrial proceedings, including the preparation of a Report and Recommendation on dispositive

motions [14].[1]  Before me are motions for summary judgment by defendants Jensen Cranberry

Bogs, Inc. ("Jensen") [100], Alpine Foods, LLC ("Alpine") [105], and plaintiff Cliffstar

Corporation ("Cliffstar") [106].[2] Oral argument was held on May 16, 2012 [134].

        For the following reasons, I recommend that the motions be granted in part and

denied in part.

## BACKGROUND

**Facts**

        In 1996, Cliffstar entered into a Supply Contract with Jensen, whereby Cliffstar

agreed to annually purchase Jensen's cranberry crop ([112-1], p. 2 of 99).  In September 2008,

_____

        [1]        Bracketed references to CM/ECF docket entries.

        [2]        Prior to commencement of discovery, Cliffstar moved for summary judgment on October
14, 2009 [23]. In a Report and Recommendation dated January 14, 2010 [56], I recommended that its
motion be granted in part and denied in part. By Order dated May 13, 2010, Judge Arcara adopted that
recommendation [62].

with Cliffstar's consent, Jensen and Alpine entered into a Crop Purchase Agreement ([112-1], p. 9 of 99), calling for the sale of Jensen's 2008 crop to Alpine rather than Cliffstar. Section 5 of that Agreement provided that "title to all cranberries purchased by Alpine from [Jensen] shall pass to Alpine upon the unloading of the cranberries at Alpine's receiving station", and §8 warranted that "all cranberries delivered pursuant to this Agreement are . . . in compliance with all federal, state and local laws, rules and regulations . . . [and] are fit for human consumption".

The crop was delivered to Alpine in the fall of 2008. Jensen's owner, Gary Jensen, testified that "I had title to the crop up until the point it was delivered to Alpine's receiving station at which time title transferred to Alpine". Jensen deposition [107-5], p. 107. When asked what rights he retained in the crop thereafter, he replied: "We had a contract that he had to pay me for the crop and so in that manner, I guess I had some rights to some payment for the crop, but not the physical fruit" (id., p. 108).

Upon receipt of the 2008 crop from Jensen, Alpine "took samples . . . and cleaned, binned, and sent the rest to off-site freezer storage". Alpine's Memorandum of Law [105-1], p. 4. In late November 2008, Alpine sent samples of the crop to a testing lab (Covance, Inc.) to test for pesticide residue (Smith deposition [107-7], p. 34). It received a test report "sometime during the first week in December" (id., p. 35). That report "showed acephate [a pesticide] residue of 1489 parts per billion (ppb), nearly triple the 500 ppb amount allowed under federal regulation". Smith declaration [105-3], ¶13; [105-16], p. 2 of 14.

However, Alpine's president, Jonathan Smith, testified that he did not review the test results upon receiving them - instead, he gave them to Alpine's quality control manager, Linda White, who "just put them into the file". Smith deposition [107-8], p. 105. When asked

why he did not review the test results when received, Smith replied that "it was more of a file stuffer for me" (id., p. 106).

Notwithstanding the test results, Alpine made a first payment of $600,000 to Jensen on December 10, 2008, and a second payment of $600,000 on January 14, 2009 ([112-1], p. 66 of 99). In early February 2009, Alpine asked Jensen to modify the payment schedule for the third payment by allowing two separate payments of $300,000, rather than a single payment of $600,000, and Jensen agreed (Smith deposition [107-7], pp. 45-47). On February 20, 2009, Alpine made a payment of $300,000 ([112-1], p. 66 of 99).

Alpine claims to have "discovered the non-conformity" regarding excessive pesticide residue in late February 2009 (Smith deposition [107-7], p. 52). Smith testified that "I had Linda grab [the test results] out of the file for me and I looked at them and saw the acephate numbers and made a call" to Jensen (Smith deposition [107-8], p. 108). Thereafter, Alpine ceased making payments to Jensen (Jensen's Memorandum of Law [113], p. 4), and the parties engaged in further testing which was conflicting as to whether the pesticide levels were in compliance with their Agreement (id.).

Although Jensen claims that Alpine "offered to redeliver the 2008 Crop to Jensen or Jensen's designee to allow Jensen to mitigate its damages" from Alpine's alleged breach of the 2008 Agreement with Jensen (Jensen declaration [101], ¶¶7-8), Jonathan Smith states that this allegation "is absolutely false". Smith declaration [111-2], ¶21. According to Smith, "Mr. Jensen said that Alpine should keep 1,500,000 pounds of cranberries from the 2008 Crop . . . . Mr. Jensen did not put any restrictions on what Alpine could do with those cranberries - not that he

had any right to do so. Mr. Jensen asked me to transfer the remainder of the 2008 Crop to Cliffstar." Id., ¶20.[3]

On or about April 23, 2009, Jensen and Cliffstar entered into a Cranberry Marketing Agreement ([112-1], p. 17 of 99), together with "Addendum A" to that Agreement (id., p. 22 of 99), which states that it "replaces any and all previous contracts" between the parties (Addendum A, ¶1). Paragraph 4 of Addendum A required Cliffstar "to purchase up to 67,516 barrels of the 2008 crop from [Jensen]", to be "paid in 3 equal installments, not to commence before May 1st, 2009 with the additional 2 payments 30 days and 60 days following the original payment date".

The introductory paragraph of Addendum A states that it "is subject to all other terms and conditions set" in the Cranberry Marketing Agreement. Among those terms and conditions is ¶14, which provides that "[d]uring the continuance of any . . . Event of Default, the non-defaulting party may, at its option, terminate this Agreement by written notice to the defaulting party, and in addition may enforce any rights or remedies it may have at law or in equity". Paragraph 13 defines "Events of Default" as the failure "to comply with any term, condition, provision or covenant of this agreement, [where] such failure shall continue for more than thirty (30) days after written notice thereof by the non-defaulting party to the defaulting party". However, ¶4 of Addendum A further provides that "should Cliffstar default on payment

---

[3]     Gary Jensen acknowledges that the $1.5 million which Alpine paid corresponds to 15,000 barrels of cranberries. Jensen deposition [107-5], p. 81. While admitting that at one point he discussed a compromise with Alpine whereby he would "keep the $1.5 million and [Alpine] was going to keep the 15,000 barrels", with "the remainder of the fruit going to go to Cliffstar and Cliffstar was going to pay Jensen for it" (id., p. 83), he claims that "that offer became null and void and off the table . . . when Alpine released all of the fruit to Cliffstar on June 8th" (id., p. 84).

for the 2008 crop . . . this Agreement *shall be terminated* and the previous Agreement shall take effect" (emphasis added) - apparently without the "notice and cure" opportunity referenced in ¶13 of the Cranberry Marketing Agreement.

Alpine claims that in early June 2009, Cliffstar orally agreed to purchase the 1.5 million pounds of cranberries from Alpine (Smith deposition [107-7], pp. 71-72).  Alpine released the entire 2008 cranberry crop to Cliffstar under separate bills of lading: 1.5 million pounds (15,000 barrels)  for its own account, and the balance for Jensen's account. Smith declaration [111-2], ¶25. In a June 14, 2009 e-mail to Jonathan Smith of Alpine, Gary Jensen stated that "I was surprised that you released all of the fruit and didn't keep the 15,000 barrels that you have already paid me for. I can only assume that you have no market for it at any price for whatever reason" ([130], p. 5 of 5) (emphasis in original).

Cliffstar made a first payment to Jensen on May 15, 2009 in the amount of $1,364, 000, a second payment on June 15, 2009 in the amount of $1,473, 702.90, and a third payment on July 17, 2009 in the amount of $626,969.74. Cliffstar's Memorandum of Law [108], p. 4. The third payment was smaller than the first two payments because both Alpine and Jensen sent letters to Cliffstar demanding payment for the 15,000 barrels of cranberries in dispute. Alpine's letter dated July 16, 2009 [107-17] stated that it "took title to the cranberries upon the unloading of those berries at Alpine's receiving station . . . . Mr. Jensen cannot sell berries he does not own. Your company is now on notice that he does not own the fruit in question. Alpine looks forward to receiving payment from you for its fruit."

Jensen's letter dated July 22, 2009 [107-18] demanded payment for all cranberries released by Alpine to Cliffstar, including the disputed cranberries, stating: "you are hereby

notified that the [April 23, 2009 Cranberry Marketing Agreement] has been breached for failure

to make the payment due on a timely basis and the failure to make the payment of the total

amount due . . . . Please take further notice that, pursuant to the provisions of paragraph 4 of . . .

Addendum A to the agreement, [Jensen] elects to terminate the agreement and to re-implement

the previous existing agreement."


**The Parties' Claims**

Cliffstar commenced this action on August 4, 2009, seeking a declaration "that

Cliffstar did not breach the 2009 Supply Contract with Jensen and . . . determin[ing] to whom,

and in what amount, it should pay for the [disputed] cranberries" (Complaint [1], ¶53).

Simultaneously, it moved pursuant to Fed. R. Civ. P. ("Rule") 67 for an order allowing it to

deposit in court the sum of $990,378.18 (the amount which it withheld from payment), stating

that it "is ready, willing and able to pay for the crop but is not certain which entity it should pay".

Gaffney Declaration [2], ¶9. Judge Arcara granted that motion on August 14, 2009 [4], and the

funds were deposited with the court that day.

Jensen has counterclaimed against Cliffstar for a declaration that the 2009

Cranberry Marketing Agreement has been terminated and the 1996 Supply Contract reinstated as

a result of Cliffstar's default in payment, and for judgment "in an amount of no less that

$990,378.18 and as much as $3,624,515.87" for Cliffstar's breach of its purchase obligations.

Jensen's First Amended Answer [15], ¶88. Jensen has also crossclaimed against Alpine, seeking

damages of at least $1,786, 935.47 resulting from Alpine's alleged breach of the 2008 Crop

Purchase Agreement with Jensen. Id., ¶¶100-102.

-6-

Alpine has likewise counterclaimed against Cliffstar for payment of the funds deposited into court by Cliffstar (Alpine's Second Amended Answer [95],¶129), and has crossclaimed against Jensen for damages "in no event less than $2,083,639.52" arising from Jensen's alleged breach of the 2008 Agreement with Alpine (id., ¶107).

**The Pending Motions**

Now that pretrial discovery is complete, all parties have moved for summary judgment:

■     Jensen seeks summary judgment [100] directing the court to pay it the $990,378.18 previously deposited into court by Cliffstar, declaring that its 2009 Cranberry Marketing Agreement with Cliffstar has been terminated and that the 1996 Agreement has been reinstated, and scheduling a trial to determine amounts owing from Cliffstar under the 1996 Agreement;

■     Alpine seeks summary judgment [105] awarding it the same $990,378.18 previously deposited into court by Cliffstar, awarding it damages against Jensen in the amount of $2,234, 376 for breach of the 2008 Purchase Agreement between Alpine and Jensen, and dismissing Jensen's claims against it for breach of the same Agreement; and

■     Cliffstar seeks summary judgment [106] declaring that it has not breached the 2009 Cranberry Marketing Agreement with Jensen, and dismissing all of Jensen's claims against it.

## ANALYSIS

A.     **Have Jensen or Alpine Established Their Entitlement to Payment for the Disputed Cranberries as a Matter of Law?**

Since Cliffstar acknowledges its obligation to pay either Jensen or Alpine for the 15,000 barrels of cranberries in dispute, I must determine whether either Jensen or Alpine - or neither of them - have established their entitlement to that payment as a matter of law.

The parties agree that Alpine took title to the cranberries upon delivery to its facility in the fall of 2008. Gary Jensen admitted in his deposition that while Jensen thereafter had a right to payment from Alpine for the cranberries, it no longer had a right to the berries themselves: "I guess I had some rights to some payment for the crop, but not the physical fruit" Jensen deposition [107-5], p. 108.

Although Jensen now claims that Alpine agreed to release all of the cranberries - including the 15,000 barrels in dispute - to Cliffstar for Jensen's benefit, that claim is impossible to reconcile with Gary Jensen's June 14, 2009 e-mail to Alpine, in which he states: "I was surprised that you released all of the fruit and didn't keep the 15,000 barrels that you have already paid me for. I can only assume that you have no market for it at any price for whatever reason". [130, p. 5 of 5] (emphasis in original). The only reasonable interpretation of this e-mail is that Jensen *did* acknowledge Alpine's right to sell the 15,000 barrels for its own account if it had a market for them. Cliffstar was that market.[4]

---

[4]     In a letter to Alpine's attorney dated July 15, 2009, Jensen's attorney stated: "apparently your client elected to release not only my client's berries, but an additional 15,000 barrels to Cliffstar.  I do not know why he elected to do this, but they were released to Cliffstar under my client's name" ([107-17], p. 3 of 3). However, it is clear from the record that the 15,000 barrels were released under a bill of lading for Alpine's account, not Jensen's.

Therefore, Jensen's contrary assertion in this litigation does not create a genuine issue of material fact as to whether Jensen or Alpine had the right to sell the disputed cranberries. "[I]n certain cases a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised genuine issues of material fact to be decided by a jury." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011), cert. denied, 132 S.Ct. 1744 (2012). *See also* Scott v. Harris 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); Tabbaa v. Chertoff, 509 F.3d 89, 93 n.1 (2d Cir. 2007) ("Our obligation to draw all reasonable inferences in favor of plaintiffs does not mean we must credit a version of the facts that is belied by the record"); Mojica v. Southwest Airlines Company, 1999 WL 262130, *4 (N.D.Ill. 1999), app. dismissed, 210 F.3d 375 (7th Cir. 2000) ("The court may properly refuse to consider [a party's] after-the-fact self-serving deposition testimony where that testimony is contradicted by her prior written statements").

Since I find no genuine issue of fact as to Alpine's right to sell the disputed cranberries to Cliffstar, I recommend that payment of the funds which Cliffstar deposited in court be made to Alpine.

**B.    Has the Cliffstar-Jensen Cranberry Marketing Agreement Been Terminated?**

Addendum A to the 2009 Cranberry Marketing Agreement provides that "[t]he 2008 crop will be paid in 3 equal installments, not to commence before May 1st, 2009 with the

additional 2 payments to be made 30 days and 60 days following the original payment date"

([112-1], p. 22 of 99, ¶4A). Since Cliffstar's first payment was made on May 15, 2009

(Cliffstar's Memorandum of Law [108], p. 13), its third payment was due 60 days thereafter,

namely by July 14, 2009. However, Cliffstar admits that it did not make the third payment until

July 17, 2009 (Cliffstar's Memorandum of Law [108], p. 14). Cliffstar argues that its delay in

making the third payment should be disregarded, since "(1) the payment was made well within

the cure period set forth in the [Cranberry Marketing Agreement]; and (2) even if there were no

cure period, any such breach would be immaterial". Id., p. 14.

       Addressing Cliffstar's second argument first, I am unconvinced that Cliffstar's

failure - even if by only a few days - to meet the payment deadline specified in Addendum A can

be considered "immaterial". "If by the contract itself the date of performance is fixed, then time

is essential, and failure to perform on the day indicated is ground for a rescission." John F.

Trainor Co. v. G. Amsinck & Co., 236 N.Y. 392, 394 (1923); Towers Charter & Marine Corp. v.

Cadillac Insurance Co., 894 F.2d 516, 523 (2d Cir. 1990) ("the parties are presumed to have

agreed that time is of the essence unless there is contract language to the contrary");  Vitol S.A.,

Inc. v. Koch Petroleum Group, LP, 2005 WL 2105592, *8 (S.D.N.Y. 2005) ("Where a definite

time of performance is specified in a contract, time is of the essence unless the circumstances

affirmatively indicate a contrary intent").

       In any event, a material breach is not the only basis upon which a contract may

be terminated: it may also be terminated for any reason which the parties specify in the contract.

See 17A Am. Jur. 2d., Contracts §524 ("there are several . . . methods of discharging contracts,

including rescission . . . by virtue of a contractual provision therefor . . . and rescission for . . . a

material breach or default"). "Where the grounds upon which a party may cancel a contract are stated in the contract, the contract controls as to such grounds." 22A <u>N.Y. Jur. 2d</u>, Contracts §503.

Addendum A clearly states that "[s]hould Cliffstar default on payment for the 2008 crop, this Agreement shall be terminated and the previous Agreement shall take effect". Although the word "'[d]efault' is not defined . . . in the Agreement, . . . in common parlance, 'default' means 'the omission or failure to perform a legal or contractual duty or the failure to pay a debt when due.'" <u>In re CBGB Holdings, LLC</u>, 439 B.R. 551, 556 (Bk. S.D.N.Y. 2010) (*quoting* <u>Black's Law Dictionary</u> 480 (9th ed. 2009)). Since Cliffstar clearly failed to make the third payment "when due", it was in "default on payment for the 2008 crop" within the meaning of Addendum A.

Cliffstar's argument that the Agreement can only be terminated for a material breach "would effectively require the Court to write into the Contract a provision that was not there when the Contract was drafted." <u>AM Medica Communications Group v. Kilgallen</u>, 261 F.Supp.2d 258, 263 (S.D.N.Y.), <u>aff'd</u>, 90 Fed.Appx. 10 (2d Cir. 2003). Paragraph 4 of Addendum A provides for termination upon Cliffstar's "default" in payment, not its *material* default. While it perhaps might have made more sense to limit the contractual right of termination to material defaults only, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing . . . . If the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." <u>Law Debenture Trust Co. of New York v. Maverick Tube Corp.</u>, 595 F.3d 458, 468 (2d

Cir. 2010).[5] Accordingly, were I to focus solely upon ¶4 of Addendum A, I would likely conclude

that the 2009 Cranberry Marketing Agreement was terminated by Cliffstar's default in payment,

and that the prior agreement (the 1996 agreement) was thereby reinstated.

However, in ascertaining the proper meaning of an agreement, it is "important to

read the document as a whole to ensure that excessive emphasis is not placed upon particular

words or phrases." Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005). The court's

"task is to determine whether . . . clauses are ambiguous when read in the context of the entire

agreement", Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7

F.3d 1091, 1095 (2d Cir. 1993), and it must "safeguard against adopting an interpretation that

would render any individual provision superfluous." Law Debenture Trust Co. of New York v.

Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010).

The default clause contained in ¶4 of Addendum A is not the only provision of the

2009 Cranberry Marketing Agreement dealing with termination: the first paragraph of Addendum

A states that it is "subject to all other terms and conditions" of that Agreement, which must

therefore include ¶¶13 ("Events of Default") and 14 ("Remedies"). However, these paragraphs

address a different contingency than the "default" clause of Addendum A. "A 'default' is simply

not the same thing as an 'Event of Default.'" Derry Finance N.V. v. Christiana Companies, Inc.,

797 F.2d 1210, 1214 (3rd Cir. 1986).

---

[5]     Cliffstar itself argues that "courts may not by construction add or excise terms, nor
distort the meaning of those used and thereby make a new contract for the parties under the guise of
interpreting the writing." Cliffstar's Memorandum of Law [108], p. 15.

An "Event of Default" under ¶13 is a default ("failure to comply with any term . . . of this Agreement") which continues for more than 30 days after written notice from the non-defaulting party. If an "event of Default" as defined in ¶13 occurs, then ¶14 gives the non-defaulting party the *option* of terminating the 2009 Cranberry Marketing Agreement. By contrast, a "default" under ¶4 of Addendum A does not give either party the option of terminating the Agreement - instead, termination is automatic ("this Agreement shall be terminated and the previous Agreement shall take effect").

I find it impossible to reconcile ¶4 of Addendum A with ¶¶13-14 of the 2009 Cranberry Marketing Agreement, for each renders the other superfluous. If termination of the Agreement upon default is automatic (as in ¶4 of Addendum A), then no purpose would be served by providing for 30 days' notice of default, as in ¶13 of the Agreement, or in giving the non-defaulting party the "option" of terminating the Agreement, as in ¶14.[6] Conversely, if the party in default is entitled to 30 days' written notice before the non-defaulting party may invoke the option of terminating the Agreement (as in ¶¶13-14 of the Agreement), then the provision in ¶4 of Addendum A for automatic termination cannot be enforced.

Given the irreconcilability of these conflicting provisions, I cannot determine as a matter of law whether Cliffstar's delay in payment results in termination of the 2009 Cranberry Marketing Agreement. *See* Sayers v. Rochester Telephone Corp. Supplemental Management

---

[6]     Jensen's conduct lends to the confusion. In its July 22, 2009 letter [107-18], Jensen advised Cliffstar that "the [2009 Cranberry Marketing Agreement] has been breached for failure to make the payment due on a timely basis . . . . [P]ursuant to the provisions of paragraph 4 of . . . Addendum A to the agreement, [Jensen] *elects* to terminate the agreement and to re-implement the previous existing agreement." Since termination would be automatic under ¶4 of Addendum A, there was nothing for Jensen to "elect".

Pension Plan, 7 F.3d 1091, 1096 (2d Cir. 1993) ("we believe that the plain language of the [contract provisions], when considered together, lacks a definite and precise meaning, unattended by a danger of misconception . . . . Since the language is ambiguous, summary judgment was improperly granted"); Munroe v. Continental Western Insurance Co., 2011 WL 6026999, *5 (E.D.Mo. 2011) ("To the extent that the conflicting . . . language cannot be reconciled . . . the [contract] is ambiguous").

**C.      Is Alpine Entitled to Summary Judgment for Damages Against Jensen?**

Alpine seeks partial summary judgment against Jensen in the amount of $2,234,376. Alpine's Notice of Motion [105], ¶1. In support of that motion, it argues that "tests of three separate samples of the 2008 Crop . . . showed acephate residue levels well above the 500 ppb limit set by federal regulation". Alpine's Memorandum of Law [105-1], p. 11. It claims that it "paid Jensen $1,500,000 in connection with the 2008 Crop" and "incurred packaging costs, cleaning costs, transportation and freezer charges, as well as a mandatory assessment from the Cranberry Marketing Association, totaling $721, 726.53", and argues that "[a]ll of these costs . . . flowed directly from Jensen's delivery of the tainted crop" (id., p. 12).  In response, Jensen argues that "Alpine has not demonstrated and cannot demonstrate the absence of material issues of fact". Jensen's Memorandum of Law [113], p. 1.

I agree with Jensen. Alpine admits that it "definitely got the cranberries. No question. Accepted them." Transcript of oral argument [134], p. 60. Under Wisconsin law,[7]

---

[7]      The Alpine-Jensen Agreement is governed by Wisconsin law. [112-1], p. 13 of 99, §13; Jensen's Memorandum of Law [113], p. 6, n. 11.

"[t]he buyer must pay at the contract rate for any goods accepted". Wis. Stat. §402.607(1).

"Revocation of acceptance must occur within a reasonable time after the buyer discovers or

should have discovered the ground for it." Id., §402.608(2). Moreover, "when a buyer accepts

goods, the buyer 'must within a reasonable time after the buyer discovers or should have

discovered any breach notify the seller of breach or be barred from any remedy'." Wilson v.

Tuxen, 754 N.W.2d 220, 232 (Wis.App. 2008) (quoting Wis. Stat. § 402.607(3)(a)); transcript of

oral argument [134], p. 64 ("2-607 requires timely notification of any breach of contract or the

buyer is barred from any remedy").

      It is undisputed that although Alpine received the initial test report showing

allegedly excessive pesticide levels in early December 2008, it did not notify Jensen of the

alleged nonconformity until late February 2009, when Jonathan Smith claims to have read the

report for the first time. However, even "if he did not read it when he received it, he . . . [is]

nonetheless chargeable with knowledge of its contents as of the date of receipt". Burns v.

Imagine Films Entertainment, Inc., 165 F.R.D. 381, 390 (W.D.N.Y. 1996) (Foschio, M.J.)

(quoting Price v. Concourse Super Service Station, Inc., 32 Misc.2d 349, 356 (Sup. Ct. Nassau

Co.1961)).

      Therefore, there is a question of fact as to whether Alpine acted within a

reasonable time after it "should have discovered" the alleges breach. "Ordinarily, what

constitutes a 'reasonable time' is a question of fact for a jury." Wilson, 754 N.W.2d at 232 (for

notice of breach under Wis. Stat. §402.607(3)(a)). "Ordinarily, what constitutes a reasonable time

is a question of fact for the factfinder." <u>Viking Packaging Technologies</u>, 804 N.W.2d at 516 (for

revocation of acceptance under Wis. Stat. §402.608(2)).[8]

## CONCLUSION

For these reasons,  I recommend that the motions [100, 105, 106] be granted to the

extent of awarding to Alpine the funds deposited into court by Cliffstar, but otherwise be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation

must be filed with the clerk of this court by August 6, 2012 (applying the time frames set forth in

Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this

deadline must be made to Judge Arcara.  A party who "fails to object   timely . . . waives any

right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d

Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but were not, presented to the

magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal</u>

<u>Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local

Rules of Civil Procedure, written objections shall "specifically identify the portions of the

proposed findings and recommendations to which objection is made and the basis for each

objection . . . supported by legal authority", and must include "a written statement either certifying

---

[8]    I further agree with Jensen's argument that there are other issues of fact which also warrant the denial of summary judgment to Alpine on its damage claim, such as whether the pesticide levels were actually excessive and whether the alleged nonconformity substantially impaired the value of the crop to Alpine. *See* Jensen's Memorandum of Law [113].

-16-

that the objections do not raise new legal/factual arguments, or identifying the new arguments and

explaining why they were not raised to the Magistrate Judge".  Failure to comply with these

provisions may result in the district judge's refusal to consider the objections.


Dated: July 18, 2012

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge