UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CLIFFSTAR CORPORATION

                             Plaintiff,           Civil Action No. 09 CV 0690(A)

     v.

ALPINE FOODS, LLC and
JENSEN CRANBERRY BOGS, INC.

                            Defendants

---

## PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

---

Defendant, Jensen Cranberry Bogs, Inc. ("Jensen"), by and through its counsel, Gross,

Shuman, Brizdle & Gilfillan, P. C., for its proposed Findings of Fact and Conclusions of Law,

states as follows:

## I.      PROPOSED FINDINGS OF FACT

**A.**    **The Parties**

    1.      Jensen is a grower of cranberries, headquartered in Warrens, Wisconsin. Jensen

has been a family-owned business since the WWII era. Jensen has been owned and operated by

Gary Jensen and his wife, Rhonda Jensen, since 1982, when they purchased it from Gary

Jensen's parents. (TR 28/15 – 29/4)[1].

---

[1] The prefix "TR" refers to the transcript of the bench trial conducted over the three day period,
September 16-18, 2015. Transcripts for each day of the trial were filed with the Court and bear
Dkt. Nos. 262, 263 and 264, respectively.

2.      Jensen, and its affiliated entities Castlerock Cranberry Bogs and North Haven Bogs, produce cranberries for the purpose of selling the same to handlers who in turn either produce or sell to producers of cranberry products.  (TR 32/20 – 33/9).

3.      Over the years, Jensen has sold its cranberries to various handlers, including Oceanspray and Cliffstar Corporation ("Cliffstar").  (TR 32/20 – 33/9).

4.      Alpine Foods, LLC ("Alpine"), is a handler or purchaser of cranberries, with its headquarters and processing facility located in Rome, Wisconsin.  (TR 119/18 – 120/8).

**B.    The Alpine Contract**

5.      In 2008, Jonathan Smith, President and co-owner of Alpine ("Smith"), approached Jensen and expressed Alpine's interest in purchasing Jensen's entire crop for the 2008 year (the "2008 Crop").  Smith advised Gary Jensen that 2007 had been a good year for Alpine and that Alpine had run out of fruit to sell.  Smith wanted to avoid a shortage in 2008.  (TR 44/14 – 45/4).

6.      In 2007, Alpine purchased approximately eight million pounds of cranberries.  (TR 271/5-15).

7.      In 2008, Alpine contracted to purchase approximately fifteen million pounds of cranberries, or almost double the amount purchased in 2007.  (*Id.*).

8.      Jensen and Alpine entered into a Crop Purchase Agreement made effective as of September 4, 2008, which was executed by Alpine on September 22, 2008, and by Jensen on September 24, 2008 (the "Alpine Contract").  (Jt. Ex. 1).

9.      Alpine drafted the Alpine Contract and, with the exception of a hand-written change as to the date on which Jensen was to provide pesticide reports, no changes were made by Jensen to the agreement as drafted by Alpine.  (TR 46/2-14).

- 2 -

10.     The Alpine Contract was for a one-year term, and required Jensen to sell its entire 2008 Crop to Alpine.  (Jt. Ex. 1 at pg. 1, ¶1).  Alpine agreed to pay to Jensen $1.00/lb. or $100.00 per barrel.  (*Id.* at p. 2, ¶3).

11.     As stipulated at trial, the 2008 Crop consisted of 6,750,000 lbs. of cranberries (TR 103/11 – 104/4), or roughly 67,500 barrels (TR 53/7-9), approaching nearly 50% of Alpine's overall purchases of cranberries in 2008.

12.     Pursuant to paragraph 9 of the Alpine Contract, Alpine had the right to enter upon Jensen's property, "for the purposes of inspecting the crop, including testing the marsh and the cranberries located thereon, and [Jensen's] compliance with this agreement.  This right to enter includes, but is not limited to pre-harvest inspections." (Jt. Ex. 1 at p. 4, ¶9).

13.     Mr. Jensen confirmed at trial that Alpine did not conduct any pre-harvest inspection of or testing on the 2008 Crop and Alpine offered no evidence to the contrary at trial. (TR 180/13 – 181/21).

14.     Jensen delivered the 2008 Crop to Alpine at Alpine's receiving station in Rome, Wisconsin, between the dates of October 12, 2008 through October 27, 2008.  (Ex. 5, particularly pages bearing bates nos. "Jensen 000193" and "Jensen 000317").

15.     Alpine accepted the entire 2008 Crop at Alpine's receiving station in Rome, Wisconsin.  (TR 58/25 – 59/7).

16.     Following Alpine's acceptance of the 2008 Crop, Alpine promptly proceeded to freeze the fresh cranberries delivered to it.  (TR 258/17 – 259/10).

17.     The Alpine Contract, at paragraph 8 and in pertinent part, provides:

### 8. COMPLIANCE BY GROWER

The Grower represents, warrants and agrees that all cranberries delivered pursuant to this Agreement are and shall have been grown and delivered in compliance with all federal, state and

local laws, rules and regulations… are fit for human consumption and for sale in interstate commerce, and are not adulterated.  Upon request by Alpine, the Grower shall furnish its chemical crop application information relative to type, rate and dates of application and otherwise cooperate with Alpine and its representatives in connection with any pesticide screening services. In any event, the Grower agrees to furnish Alpine by September 25 of each crop year, with a written statement of the treatment of the cranberries with any "pesticide" as defined in the FIFR Act.  If the Grower breaches any provision of this Paragraph, Alpine may refuse to accept delivery of all or any portion of the cranberries.

(Ex. 1 at pp. 3-4, ¶8).

18.    Jensen delivered the requisite chemical crop application documentation to Alpine on September 25, 2008.  (Ex. 30, 31; TR 57/11 – 58/24).

19.    Alpine never raised any concerns or took any issue with the pesticide application information provided to it by Jensen, and Alpine never refused to accept delivery of any portion of the 2008 Crop.  (TR 58/25 – 59/7; TR 182/2-17, 325/7-13).

20.    Smith advised Gary Jensen that he had received the agrochemical logs provided by Jensen and that the 2008 Crop was acceptable to Alpine.  (TR 182/2-17, 325/7-13).

21.    Smith had experience in, and in some cases oversaw, the application of pesticides for some cranberry growers.  (TR 254/10 –/20).

22.    The Alpine Contract, at paragraph 2(e), provides, in pertinent part:

(e)    **Grower Representative**.    Grower has the right, at Grower's expense, to have representatives that are familiar with the processing and testing of cranberries and who are reasonably acceptable to Alpine, present at the time of delivery to check weighing, sampling and testing of the cranberries delivered by Grower to Alpine.

(Ex. 1 at p. 1, ¶2).

23.    It is common to include such a provision, so as to permit a grower to be present at the time of a handler's sampling or testing of the grower's crop to ensure that the fruit is actually

- 4 -

coming from the grower's crop, and to permit a grower to take some samples itself and go to another testing facility for confirmation.  (TR 48/25 – 49/8).

24.     Alpine did not sample or test the 2008 Crop prior to or at the time of delivery. (TR 180/13 – 181/21).

25.     By contrast, most handlers test the crop for pesticides in the field prior to harvest. (TR 203/20-24).

**C.     Payments by Alpine**

26.     In accordance with the crop payment schedule set forth at Schedule A to the Alpine Contract (Jt. Ex. 1 at p. 8), Alpine made its initial payment on or about December 13, 2008, in the amount of $600,000.  (*Id.*; TR 52/10 – 53/1).

27.     Alpine made its second payment under the Alpine Contract on January 24, 2009, in the amount of $600,000.  (*Id.*)

**D.     Alpine's Request to Defer a Portion of the February Payment**

28.     Alpine was required to make its third payment to Jensen in the sum of $600,000 on or before February 20, 2009 (the "February Payment).  (*Id.*)  Prior to the February Payment due date, Jonathan Smith approached Gary Jensen to request that Jensen defer a portion of the February Payment.  Smith explained that Alpine was having cash flow issues, as well as difficulty selling the 2008 Crop into the market at a price by which Alpine could pay Jensen the full amount promised under the Alpine Contract.  (TR 62/7-12).

29.     Smith also sought additional time to enable Alpine to bring to market a new product, Berry Bits.  Smith stated that adding Berry Bits into the marketplace would ultimately allow Alpine to meet its obligations under the Alpine Contract.  (TR 62/12-17).

30.     Smith did not raise any issue as to the quality of the 2008 Crop.  (TR 62/18-20).

31.     Jensen and Alpine agreed that Alpine could defer one-half of the February

Payment, and that Alpine would make a payment of $900,000 to Jensen on or before March 20,

2009, together with applicable interest on the deferred portion of the February Payment.

(TR 63/5-15).

32.     On February 23, 2009, Alpine made payment to Jensen in the amount of $300,000

(Jt. Ex. 1 at p. 8).

33.     Alpine never made the fourth payment that was due on March 20, 2009.

(TR 64/1-2).

34.     For the 2008 crop year, the overall yield in Wisconsin was larger than expected

which resulted in a dramatic drop in the price paid by producers to growers and handlers, such as

Jensen and Alpine, respectively.  (TR 80/14 – 81/10).

35.     A substantial drop in the price being paid by producers of cranberry products for

cranberries occurred after the execution of the Alpine Contract and prior to February 20, 2009.

(*Id.*)

**E.      Alpine's Test Results of the 2008 Crop**

36.     Alpine did not undertake any pre-harvest test of the 2008 Crop, despite its right to

do so under the terms of the Alpine Contract.  (TR 180/13 – 181/21; Jt. Ex. 1).

37.     Instead, Alpine waited until November 28, 2009, more than six weeks from its

receipt and acceptance of the first delivery of the 2008 Crop, to send a purported sample of the

2008 Crop out for testing to Covance, a testing laboratory.  (Jt. Ex. 7; Ex. 36).

38.     Neither a representative from Jensen nor a representative from Cliffstar was

present at the time Alpine selected a sample from the 2008 Crop to be sent to Covance in

November, 2008.  (TR 68/3-6, 72/11-14).

39.     Alpine presented no evidence as to the identity of the individual who selected Alpine's initial sample, or any evidence as to the manner in which the sample was handled. (*Id.*; TR 269/23 – 270/8, 289/18 – 290/6).

40.     Jonathan Smith voluntarily chose not to come to trial and testify, despite his being physically available to do so. (TR 4/25 – 5/4; 6/13-18).

41.     The sample submitted by Alpine purportedly derived from a small sample of frozen cranberries kept at Alpine's on-site freezers and referred to as "retains" or the "retained sample". (TR 269/15-19; 269/23 – 270/8; 288/17-21).

42.     The results of samples were received by Alpine from Covance on December 4, 2008. (TR 289/25 – 290/6).

43.     However, it was not until early to mid-March 2009 that Smith advised Gary Jensen of these test results and his view that the 2008 Crop was over tolerance for acephate. (TR 64/1-8; TR 289/25-290/6).

44.     In other words, Smith first raised any issue at to the 2008 Crop five (5) months after Jensen's initial delivery and Alpine's acceptance of the 2008 Crop and three (3) months after Alpine received the test results.

45.     Jensen disagreed with Smith and disputed Alpine's claim that the 2008 Crop was over tolerance. (TR 64/1-65/7).

46.     Jensen applied acephate properly and did not harvest the 2008 Crop until expiration of the pre-harvest interval of seventy-five (75) days. (*Id.*).  Smith agreed that application appeared proper based on their respective review of the agro-pesticide logs and knowledge of the pesticide application process.  (TR 181/22 – 182/17; 254/10-20).

47.     Smith took two additional samples purportedly from the 2008 Crop and submitted such samples to Covance for pesticide testing.  The results from those tests were consistent with the initial test.  (TR 295/1-15).

48.     Alpine presented no evidence to corroborate Smith's account of how these samples were selected, and no evidence as to the manner in which these samples were handled. (*Id.*)

**F.     Jensen's Testing Results**

49.     Jensen requested that further testing be undertaken; Smith expressed reluctance to do so.  (TR 69/11-22).

50.     Eventually, Smith agreed to permit an employee of Alpine, a Cliffstar representative, and Gary Jensen to collect samples of the 2008 Crop stored in freezers owned by Millard Refrigerated Services, located in Geneva, Wisconsin.  (TR 73/25 – 74/11).

51.     Smith selected the bins of fruit from which samples were to be retrieved, which corresponded to or lined up with the fruit from the same truckloads as the samples purportedly selected by Smith.  (TR 74/15-22).

52.     Smith had the sole input into the six (6) samples that were selected for the additional testing.  (TR 74/21-25; Reitz 107/12-14).[2]

53.     On April 8, 2009, the retrieval of samples from the Millard facility and the transport and delivery of such samples to Covance was witnessed in its entirety by Alpine's representative, Christine Sohns, Cliffstar's representative, Andrew Reitz, and Gary Jensen.  (TR 76/13 – 77/21; Reitz 106/9 – 108/21).

---

[2] References to "Beck ____", "Reitz ____", "Sohns ____", "Bell _____", "Sanvidge ____" refer to the page and line of the designations from the designated deposition testimony not read into the record during the trial but were recently submitted to the Court.

54.     The six (6) samples were delivered to Covance for the purpose of testing acephate levels in each of the samples.  (Ex. 34).

55.     There was no opportunity for the samples to be tampered with or otherwise altered prior to delivery of those samples to Covance.  (Reitz 108/18-21).

56.     The results for each of the six (6) samples submitted to Covance on April 8, 2009, reflected levels of acephate well below the federal tolerance standard of 500 ppb.  The respective samples reflected acephate levels of 141 ppb, 169 ppb, 176 ppb, 130 ppb and 54.5 ppb, respectively.  (TR 81/11 – 83/23; Jensen Exs. 16-21; see also, TR 178/1 – 180/10 and Jt. Ex. 36 which reflected the accurate levels after readjustment by Covance).

57.     Jensen shared the test results with Alpine as soon as Jensen obtained the results.  (TR 85/10-18).

58.     In light of Smith's reaction and suggestion that a possible explanation for the difference was that the samples were not from the "actual retains that [Smith] had taken", Jensen proceeded to obtain samples from the "retains" to have those tested as well.  (TR 85/19 – 86/8).

59.     Smith, Reitz and Gary Jensen were all present when samples were taken from the retained boxes which had been stored in Alpine's freezers at its Rome, Wisconsin location.  (TR 86/13-21; Reitz 120/22 – 121/25).

60.     The retained samples were transported to Covance and delivered in person by Gary Jensen and Andrew Reitz on May 21, 2009.  (*Id.;* Jensen Ex. 35).

61.     There was no opportunity for the sample to be tampered with or otherwise altered prior to delivery of those samples to Covance.  (Reitz 121/22-25).

62.     The results of each of the six (6) retain samples delivered to Covance on May 21, 2009, reflected acephate levels well below tolerance.  The highest sample reading was 50.3 ppb

with the other five (5) samples all registering readings of less than 40 ppb.  (TR 89/15 – 90/12; Exs. 24-29).

63.     Each of the twelve (12) tests performed by Covance, at the request of Jensen, were performed with proper laboratory protocols (Beck 14/2-13[3]) using methods reliable for measuring acephate levels in cranberries.  (TR 248/2-9).  There is no indication that any of the pesticide tests performed at Jensen's request are inaccurate in anyway.  (Sullivan 23/21 – 24/14).

**G.     Alpine's Hidden Samples**

64.     On March 31, 2009, Alpine submitted to Covance two (2) additional samples from the 2008 Crop.  (Jt. Exs. 16-17; Jensen Exs. 12-13).

65.     The results of those two tests reflected organophosphate levels of less than 0.050 ppm which, equals 50 ppb.  (*Id.*)

66.     Smith did not provide copies of these test results to Gary Jensen in March of 2009, (TR 91/23-25; Jensen Exs. 12-13), rather Jensen gained access to these results only through the discovery process in the lawsuit.  (TR 92/15-21; Jensen Exs. 12-13 reflecting Alpine Bates numbers in connection with document discovery in the lawsuit).

**H.     Further Deception on the Part of Smith**

67.     At the time Smith revealed the results of the initial test to Gary Jensen, Gary Jensen asked Smith if any other growers' crops had tested over tolerance for acephate. (TR 68/3-14; TR 96/8-15).  Smith answered in the negative.  (TR 68/7-14, 96/8-19).

68.     Only through the discovery process in this lawsuit did Jensen come to learn that Smith had submitted a sample from another grower's crop, Cool Mist, to Covance on November

---

[3] The parties have stipulated that Mr. Beck performed all the pesticide testing in evidence.

28, 2008, which was the same day as the initial purported sample from the 2008 Crop. (Jt. Ex. 6; Jensen Ex. 11).

69.     The test results of the two samples were nearly identical, with the Cool Mist sample reflecting acephate at a level of 1,413 ppb, and the purported sample of the 2008 Crop reflecting acephate at a level of 1,489 ppb.  (*Id.*).

70.     Smith knew that acephate had been misapplied on the Cool Mist crop, but accepted such crop at the time of delivery and, notwithstanding the test results, processed the crop in its entirety and sold it for human consumption.  (TR 302/20 – 303/12; 327/17 – 328/15).

71.     Only through discovery in this lawsuit did Jensen learn that Alpine had actually used a portion of the 2008 Crop in a product for human consumption.  (TR 256/7-15).

I.     **Jensen's Mitigation Efforts**

72.     Following Alpine's request to defer a portion of the February Payment, Jensen approached Cliffstar to inquire as to whether Cliffstar would be willing to purchase the 2008 Crop in the event Alpine defaulted.  (TR 185/16 – 186/6).

73.     Jensen followed up with Cliffstar in April 2009, after Alpine indicated it would not make any further payments to Jensen for the 2008 Crop. (TR 96/20 – 97/7).

74.     Cliffstar agreed to purchase the 2008 Crop at a price of $.62/lb, or $62.00 per barrel, the price at which Cliffstar was purchasing crops from other growers in 2008. (Jt. Ex. 2 at Addendum A, ¶4; Tr. 96/23 – 97/13; Sanvidge 109/11-15).

75.     Cliffstar also sought and obtained key concessions from Jensen in negotiating a new contract, with far less favorable terms to Jensen than those under the existing agreement between Jensen and Cliffstar.  (TR 97/14-21).

76.     Jensen shared all pesticide testing results with Cliffstar. (TR 98/4- 9).

77.     Jensen and Cliffstar entered into a Cranberry Marketing Agreement dated April 23, 2009, wherein Cliffstar agreed to purchase up to 67,516 barrels of the 2008 Crop, at the price of $62.00 per barrel, plus any qualifying color incentives and associated cleaning fees.  (Jt. Ex. 2).

78.     Alpine transferred all of the 2008 Crop in its possession to Cliffstar.  (Reitz 29/8-19; 31/17-20; TR 98/10-14; 186/18-20).

79.     Evidencing the fact that Alpine's default was based, not upon the quality of the 2008 Crop, but rather, the market conditions, Alpine's transfer included that portion of the 2008 Crop harvested from the North Haven bog to which acephate had not been applied.  (TR 188/4-12; TR 189/1-21; Jensen Ex. 14).

80.     Cliffstar paid to Jensen the total sum of $3,464,673.  (Jt. Ex. 4; TR 104/15-19).

**J.      Cliffstar Accepted and Used the 2008 Crop**

81.     Cliffstar accepted title to the 2008 Crop and never sought to revoke acceptance. (TR 215/11-14).

82.     Cliffstar processed and utilized the entire 2008 Crop in products for human consumption.  (TR 215/16 – 216/4).

83.     Cliffstar would not use a crop that was over tolerance for pesticides in its production.  (TR 216/6-8).

**K.      Jensen's Damages**

84.     Under the terms of the Alpine Contract, Alpine agreed to pay to Jensen $1.00 per pound, which results in a total contract price of $6,750,000 for the 2008 Crop.  (Jt. Ex. 1).

85.     Alpine paid to Jensen the total sum of $1,500,000.  (Jt. Ex. 1; Jr. Ex. 3).  As a result, $5,250,000 remained unpaid by Alpine under the Alpine Contract.

86.     Cliffstar directly paid to Jensen the total sum of $3,464,673, thereby leaving a balance due Jensen under the Alpine Contract of $1,785,327.  (Jt. Ex. 4; TR 104/15-19).

87.     In addition to its direct payments, Cliffstar paid into Court the additional amount of $990,378.18 for the 2008 Crop.

88.     The damages which Jensen is entitled to recover against Alpine for breach of contract equal $1,785,327.  Upon direction of the Court that the $990,378.18 be paid out of Court to Jensen, Jensen is entitled to recover against Alpine the difference of $794,948.82 plus applicable prejudgment interest at the statutory rate of interest provided for under Wisconsin law.

## II.     PROPOSED CONCLUSIONS OF LAW

### A.     Delivery and Acceptance Under the Alpine Contract

1.     The Alpine Contract made effective as of September 4, 2008, by and between Alpine and Jensen is a binding agreement under which Alpine agreed to purchase from Jensen the entire 2008 Crop for a price of $1.00 per pound and other incentives (Jt. Ex. 1).

2.     Jensen delivered the 2008 Crop to Alpine over a two-week period beginning October 12, 2008.  (Ex. 5; TR 58/25 – 59/7).

3.     Alpine had three (3) options at the time of delivery if the 2008 Crop did not conform to the terms of the Alpine Contract.  See, WSA 402.601 (UCC §2-601), which provides:

> Subject to s.402.612 on breach in installment contracts and unless otherwise agreed under ss.402.718 and 402.719 on contractual limitations of remedy, if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
>
> (a) reject the whole; or
>
> (b) accept the whole; or
>
> (c) accept any commercial unit or units and reject the rest.

4.      Alpine accepted the 2008 Crop in its entirety.  See, WSA 402.606, which provides as follows:

> (1) Acceptance of the goods occurs when the buyer:
>
>> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>>
>> (b) fails to make an effective rejection (s.402.602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>>
>> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller, it is an acceptance only if ratified by the seller.
>
> (2) Acceptance of any part of a commercial unit is acceptance of that entire unit.

5.      Alpine's acceptance of the 2008 Crop removes from Jensen the burden of establishing that Jensen performed its obligations under the Alpine Contract, and places upon Alpine the burden of proving revocation of its acceptance and any breach on the part of Jensen. *Central Soya Co. Inc. v. Epstein Fisheries, Inc.*, 676 F2d 939, 944 (7th Cir. 1982) (rejecting seller's argument that seller failed to plead and prove buyer's performance and holding that buyer's acceptance of catfish feed placed on buyer the burden of proving breach on the part of buyer).  See also, *77A C.J.S. Sales §567* ("Once the seller proves the contract to supply the buyer with goods, delivery of those goods to their destination, acceptance by the buyer, and payment of a part of the contract price, the burden shifts to the buyer to prove any pertinent deviation with respect to the quality of the goods from the specified standard.")

6.      Notwithstanding Alpine's burden to prove its valid revocation and a breach on Jensen's part, the evidence at trial demonstrates that Jensen complied with its obligations under the Alpine Contract, as evidenced by (i) the agro-chemical logs provided to Alpine (Alpine Exs.

- 14 -

30, 31); (ii) Alpine's review of the logs and finding the logs to be acceptable (*Id.*); (iii) Alpine's acceptance of delivery of the 2008 Crop (*Id.*) 325/7-13); (iv) Alpine's use of a portion of the 2008 Crop in a product for human consumption (TR 256/7-15); (v) Alpine's sale and transfer of the 2008 Crop to Cliffstar with knowledge it was to be used in products for human consumption (TR 308/1-4); and (vi) the use of all of the 2008 Crop in products for human consumption (TR 215/11 – 216/4).

**B.    Alpine's Revocation Defense Fails.**

7.    Alpine bears the burden of proof to establish legally effective revocation of its acceptance of the 2008 Crop.  See, WSA 402.607(4) (UCC §2-607(4)).

8.    To establish an effective revocation of its acceptance of the 2008 Crop, Alpine must establish each of the following conditions by a preponderance of the evidence:

a.    The goods delivered failed to conform with the requirements of the contract.  WSA 402.608(1);

b.    The non-conformity "substantially impaired" the value of the goods accepted.  WSA 402.608(1);

c.    Revocation occurred within a "reasonable time after the buyer discovered or should have discovered the non-conformity."  WSA 402.608(2); and

d.    No substantial change in the condition of the goods occurred between the time of acceptance and revocation.  WSA 402.608(2).

9.    Alpine failed to establish by a preponderance of evidence that it revoked its acceptance of the 2008 Crop.  For example, Mr. Smith, when asked if Alpine had rejected any portion of the 2008 Crop, testified that "we never got to that point" (TR 307/6-10), and could not

even recall if he had told Jensen that Alpine was not going to pay for the 2008 Crop. (TR 317/19-22).

          i.      **Alpine's Untimely Notice.**

      10.     A finding that Alpine's purported notice of revocation was untimely makes any determination on the issues related to non-conformity unnecessary.  As a matter of law, Alpine failed to provide notice to Jensen within a reasonable time after Alpine knew or should have known of the purported over tolerance condition of the 2008 Crop.  Such conclusion is readily drawn from the following undisputed facts:

          a.      Alpine, although having the right to conduct pre-harvest testing, elected to forego such opportunity, thereby creating an unwarranted and unreasonable delay in its purported discovery of the purported over tolerance.  Alpine should have discovered the over tolerance no later than the end of October, 2008 upon completion of delivery, (Jt. Ex. 5; TR 269/1 – 270/3), approximately five (5) months prior to Alpine first raising the issue with Jensen in March, 2009.

          b.      Alpine is charged with knowledge of the Covance test results as of December 4, 2008, the date Alpine received such results.  *Cliffstar v. Alpine and Jensen*, 2012 WL 7828966 at *8 (citing *Burns v. Imagine Films Entertainment, Inc.,* 165 F.R.D. 381, 390 (W.D.N.Y.1996) (Foschio, M.J.).  [Dkt. 135 at p. 15].  As a matter of law, Alpine knew or should have known of the purported over tolerance of acephate no later than December 4, 2008.

          c.      Alpine's three-month delay from receipt of the Covance test results until it notified Jensen in March, 2009 of Alpine's unwillingness to make further payment due to the alleged over tolerance, is unreasonable as a matter of law.  *(Id.).*

11.     Alpine's delay in notifying Jensen of its purported breach, is unreasonable as a matter of law.  See, *J. B. Bradford Piano Co. v. Baal*, 166 Wis. 134 (Wis. 1917) (one who kept goods for a period of three months with knowledge of defects in violation of warranty, and made payments, waived any breach); see also, *Wilson v. Tuxen*, 312 Wis.2d 705, 730 (Wis. Ct. Appeals 2008); (reviewing multiple instances where Wisconsin courts, applying §402.607(3)(a) found delays of seven (7) months, five (5) months and even fifty-seven (57) days in notifying the seller were not reasonable).

12.     Alpine's failure to timely notify Jensen of the alleged breach bars Alpine from any remedy relating to said breach.  See, WSA 402.607, which provides that "where a tender has been accepted" and the buyer does not notify the seller of a breach "within a reasonable time", the buyer is "barred from any remedy".

ii.     **Alpine's Failure to Satisfy Conditions Beyond Timely Notice**.

13.     In addition  to its failure to establish timely notice, Alpine failed to establish by a preponderance of evidence that the 2008 Crop did not conform to the terms of the Alpine Contract.  Alpine's efforts at trial fail to overcome the overwhelming evidence to the contrary.

14.     The results of twelve (12) tests conducted on samples indisputably from the 2008 Crop, reflect the 2008 Crop to be under tolerance.  (Jensen Exs. 16-21; Jensen Exs. 24-29; Jt. Ex. 36).

15.     The results of two (2) tests conducted on samples purportedly from the 2008 Crop, conducted by Alpine, and not disclosed by Alpine until discovery in this action.  (Jensen Exs. 12-13; Jt. Exs. 16-17; TR 92/15-21)

16.     Alpine used a portion of the 2008 Crop in products for human consumption.  (TR 256/7-15).

- 17 -

17.     Alpine sold and/or transferred to Cliffstar the 2008 Crop with knowledge that Cliffstar intended to use the 2008 Crop in products for human consumption. (TR 215/10 – 216/4).

18.     Moreover, any allegation on the part of Alpine that the 2008 Crop was "substantially impaired" is inconsistent with and contradicted by Alpine's acceptance and use of the Cool Mist crop (Jt. Ex. 6; TR 327/9 – 328/15), Alpine's use of a portion of the 2008 Crop (TR 256/7-15), and Cliffstar's use of the remainder of the 2008 Crop (TR 215/11 – 216/4).

19.     21 U.S.C. §346a is relevant to the issue of whether the 2008 Crop was "fit for human consumption" . (TR 264/16). Any food, containing pesticide chemical residue is unsafe, unless the quantity of the residue contained on or in the food is within the limits of tolerance. 21 U.S.C. §346a(a)(1). Pursuant to 21 U.S.C. §346a(a)(2), a processed food does not carry a separate tolerance for chemical residues, as it is assumed that the processed food has been made from a food in compliance with the applicable tolerance for the raw food. A raw food which does not comply with the tolerance requirements is defined by 21 U.S.C. §342(a)(2)(B) as "adulterated". Pursuant to 21 U.S.C.§331(a), "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded" is a prohibited act. Any person who violates 21 U.S.C. §331(a) is subject to the penalties set forth in 21 U.S.C. §333 which include up to a year imprisonment, and a fine of not more than $1,000.

20.     Finally, Alpine offered no evidence at trial by which it could establish by a preponderance of the evidence that the 2008 Crop did not undergo a "substantial change" in condition between the time Alpine accepted the 2008 Crop in October, 2008 and its purported notice of breach to Jensen in March, 2009. See, WSA 402.608(2).

C.   **Damages**

       i.      **Jensen's Damages.**

21.     Alpine is required to pay Jensen at the contract rate for the goods it accepted. WSA 402.607(1).

22.     The contract rate, under the Alpine Contract is $1.00 per pound for a total contract price of $6,750,000.

23.     After subtracting from the contract price the amount paid to Jensen by Alpine ($1,300,000) and by Cliffstar ($3,464,673), Jensen is entitled to an award of damages against Alpine in the amount of $1,785,327.00.

24.     The Court should direct the Clerk of the Court to pay out to Jensen the amount of $990,378.18 which was paid into Court by Cliffstar, along with any interest that has accrued thereon.  To the extent such directive is argued to implicate the Court's prior summary judgment decision (Dkt. #135, 162) recommending payment of funds which Cliffstar deposited in court be made to Alpine, courts have the inherent power to modify their interlocutory orders before entering a final judgment.  See, *Marconi Wireless Telegraph Co. v. United States*, 320 U.S. 1, 47-48 (1943); see also, *United States v. LoRusso*, 695 F.2d 45, 53 (2nd Cir. 1982) ("A district court has the inherent power to reconsider and modify its interlocutory orders prior to entry of judgment…"); F.R.Civ.P. 54(b).

25.     The Court should enter judgment for the difference of $794,948.82, plus applicable pre-judgment interest in accordance with W.S.A. 814.04(4).

      ii.     **Alpine's Damages.**

26.     Even assuming arguendo that Alpine meets is burden on liability issues, Alpine failed to present any evidence at trial concerning the proper measure of damages.

27.     Under Wisconsin law, the burden of proof to establish damages rests on the party claiming damages and must be proven with reasonable certainty.  An award of damages cannot be based on conjecture.  *Moslow Cooperage Corp. v. Weeks Pickle Co.,* 270 Wis. 179, 191.

28.     The correct measure of damages on a claim for breach of warranty is the difference between the contract price and the actual value of the goods at the time of delivery. *Id.* at 190; WSA 402.714(2).

29.     Alpine offered no competent probative evidence whatsoever as to how Jensen's purported breach of warranty caused or resulted in a reduced value for the 2008 Crop.

30.     Alpine's proof on damages was limited to the difference between what it paid to Jensen ($1.5 million) and the amount it purportedly received from Cliffstar on its sale of 1.5 million pounds at a rate of 62¢ per pound ($990,378).

31.     Alpine offered no evidence that the difference in the price under the Alpine Contract and the price paid by Cliffstar was due to the purported over tolerance issue .

32.     Rather, the evidence establishes that Cliffstar paid its "grower price" for the 2008 Crop, such price being the price it was paying growers for cranberries for that year.  (Jt. Ex. 2 at Addendum A; ¶4; TR 45/19-46/1; Sanvidge 109/11-15).

33.     Notably, Alpine presented no evidence that it received a price higher than 62¢ per pound from other customers on Alpine's subsequent sale of any cranberries that it purchased from other growers in 2008.

34.     As a matter of law, Alpine utterly failed to present evidence at trial as to damages it allegedly suffered as the result of Jensen's purported breach of warranty.

### III.   CONCLUSION

Based on the foregoing and all evidence presented at trial, Jensen is entitled to judgment

as against Alpine in the amount of $794,948.82 and applicable prejudgment interest, together

with a directive from the Court directing the Clerk of the Court to pay out to Jensen the

$990,378.18 previously paid into Court by Cliffstar and all interest accrued thereon, with such

further relief the Court deems just and proper.

Dated:     Buffalo, New York
           December 4, 2015

                                      Respectfully submitted,

                                      GROSS, SHUMAN, BRIZDLE &
                                          GILFILLAN, P.C.

                                      By:  /s/ Trevor M. Torcello
                                           Trevor M. Torcello, Esq.
                                           Hugh C. Carlin, Esq.
                                      *Attorneys for Defendant*
                                      *Jensen Cranberry Bogs, Inc.*
                                      465 Main Street, Suite 600
                                      Buffalo, New York   14203
                                      Tel:    (716) 854-4300
                                      Fax:    (716) 854-2787
                                      ttorcello@gross-shuman.com
                                      hcarlin@gross-shuman.com

Doc #458935.4

- 21 -