UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CLIFFSTAR CORPORATION,

        Plaintiff,

      v.

ALPINE FOODS, LLC,
JENSEN CRANBERRY BOGS, INC.,

        Defendants.

Index No. 09-CV-690(JJM)

---

## DEFENDANT ALPINE FOODS, LLC's
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respectfully submitted,

PHILLIPS LYTLE LLP
Attorneys for Defendant
*Alpine Foods, LLC*
One Canalside
125 Main Street
Buffalo, New York 14203-2887
Telephone No. (716) 847-8400

Edward S. Bloomberg
Amanda L. Lowe
- Of Counsel -

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. II

PROPOSED FINDINGS OF FACT............................................................................... 1

    A.    The Parties and Witnesses. ............................................................................. 1

    B.    Cranberries and the 2008 Crop.................................................................... 4

    C.    The Contract and Payments. ........................................................................ 5

    D.    Acephate, Pesticide Logs and Label Instructions. ......................................... 7

    E.    Delivery of the 2008 Crop and Covance Testing. ....................................... 10

PROPOSED CONCLUSIONS OF LAW ....................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Badger Prod. Co., Inc. v. Prelude Foods Intern., Inc.*,
    387 N.W.2d 98 (Wis. Ct. App. 1986) ................................................................ 22, 24

*Bennett v. Larsen Co.*,
    348 N.W.2d 540 (Wis. 1984)................................................................................ 20

*Century Dodge-Chrysler v. Koxlien*,
    306 N.W.2d 307 (Wis. Ct. App. 1981)................................................................. 21

*In re H.P. Tool Mfg. Corp.*,
    37 B.R. 885 (E.D. Pa. 1984) ............................................................................... 23

*J.B. Bradford Piano Co. v. Baal*,
    164 N.W. 822 (Wis. 1917) ................................................................................... 24

*Murray v. Holiday Rambler, Inc.*,
    265 N.W.2d 513 (Wis. 1978)................................................................................ 24

*Paulson v. Olson Implement Co.*,
    319 N.W.2d 855 (Wis. 1982)................................................................................ 24

*Reimer Meat v. Burroughs*,
    293 N.W.2d 184 (Wis. 1980)................................................................................ 24

*RIJ Pharm. Corp. v. Ivax Pharm., Inc.*,
    322 F. Supp. 2d 406 (S.D.N.Y. 2004) ................................................................. 22

*Tegen v. Chapin*,
    187 N.W. 185 (Wis. 1922) ................................................................................... 24

*Troutman v. Pierce, Inc.*,
    402 N.W.2d 920 (N.D. 1987)................................................................................ 22

*Viking Packaging Techs., Inc. v. Vassallo Foods, Inc.*,
    804 N.W.2d 507 (Wis. 2011)................................................................................ 23

## Statutes

Federal Insecticide, Fungicide and Rodenticide Act,
    7 U.S.C. § 136j(a)(2) (2015)........................................................................5, 12, 20

Wis. Admin. Code ATCP § 29.50 .................................................................................20

Wis. Stat. Ann. § 94.70(3) ........................................................................................20

Wis. Stat. Ann. § 401.205 .........................................................................................22

Wis. Stat. Ann. § 402.106(2) .....................................................................................20

Wis. Stat. Ann. § 402.608 ....................................................................................20, 22

Wis. Stat. Ann. § 402.711 .........................................................................................25

Wis. Stat. Ann. § 402.714 ....................................................................................21, 25

This Court has previously determined that Defendant Alpine Foods, LLC ("Alpine") is entitled to the funds paid into Court by Plaintiff Cliffstar Corporation ("Cliffstar"). [Dck. 135] The remaining issues include whether either party -- Alpine or Defendant Jensen Cranberry Bogs, Inc. ("Jensen") -- are entitled to any additional damages. Alpine respectfully submits for the Court's consideration the following Proposed Findings of Fact and Conclusions of Law:

### PROPOSED FINDINGS OF FACT

**A.      The Parties and Witnesses.**

1.      Jensen is a business that grows and cultivates cranberries. Trial Transcript p. 30, 118-19. Jensen employed approximately six full-time workers and approximately ten seasonal workers. Trial Transcript p. 30.

a.      Gary Jensen is the owner/operator of Jensen, has a high school education, and has been working in the cranberry industry since 1975. Trial Transcript p. 28-30.

2.      Alpine was a business that processed cranberries and sold frozen whole and sliced cranberries to individuals in the baking industry. Trial Transcript p. 120-121, 252, 270-71.

a.      Jonathan Smith was a member and acting President of Alpine at the time of the events in question.[1] Trial Transcript p. 251, 253. Mr. Smith's job responsibilities included overseeing all of Alpine's operations and contracting with growers and storage facilities. Trial Transcript p. 253. Mr. Smith holds a Bachelor's degree in horticulture from Penn State University, a Master's Degree in horticulture from University of Wisconsin-Madison and a doctorate in horticulture from the University of Wisconsin-

---

[1] At the time of trial, Mr. Smith was no longer the President of Alpine.

Madison.  Trial Transcript p. 251.  Prior to Alpine's formation in 2004, Mr. Smith was the

Vice-President of Research and Development for Northland Cranberries for seven years.

Trial Transcript p. 254.

           b.      Christine Sohns was Alpine's Chief Financial Officer and

accountant and was responsible for overseeing Alpine's financial books and records.[2]  Trial

Transcript p. 253-54; Deposition of Christine Sohns, dated June 15, 2011 ("Sohns Dep.")

p. 7.

           3.      Cliffstar concentrated, blended and manufactured cranberry juice.

Trial Transcript p. 119; Deposition of Randy Bell, dated June 28, 2011 ("Bell Dep.") p. 8.

           a.      Kevin Sanvidge was Cliffstar's former executive Vice-President

of administration and supply chain.  Trial Transcript p. 213-14.  Mr. Sanvidge's job

responsibilities included overseeing human resources, quality control, production planning,

customer service, logistics and grower relations.  Deposition of Kevin Sanvidge, dated

May 27, 2011 ("Sanvidge Dep.") p. 8.

           b.      Andrew Reitz was Cliffstar's director (former manager) of

grower relations.  Deposition of Andrew Reitz, dated July 13-14, 2011 ("Reitz Dep.") p. 7.

Mr. Reitz was responsible for working with Wisconsin cranberry growers, including Jensen,

assisting with horticultural issues, nutrient management recommendations and contract

issues.  Reitz Dep. p. 9-10, 14, 22.  Mr. Reitz holds a Bachelor of Science in biology with

minor in chemistry from the University of Wisconsin-Stevens Point.  Reitz Dep. p. 7.

           c.      Randy Bell was Cliffstar's senior director of fruit processing and

grower relations.  Bell Dep. p. 6.  Mr. Bell had been in charge of fruit processing at Cliffstar

---

[2] Ms. Sohns is no longer an employee of Alpine.

since 2006, was in charge of the daily operations at Cliffstar's facilities and was familiar with Cliffstar's processing of fruit (i.e. the processing of fruit into juice).  Bell Dep. p. 6-8. Mr. Bell holds a Bachelor of Science in biology from UC San Diego.  Bell Dep. p. 5.

      4.     Covance is a contract research organization that tests pharmaceutical, agricultural, food and dietary products.  Deposition of Darryl Sullivan, dated July 14, 2011 ("Sullivan Dep.") p. 5.  Covance has been testing food products for pesticides for over fifty years and is accredited by the International Standards Organization.  Sullivan Dep. p. 109. Covance was an independent testing lab that Alpine and Jensen used to perform pesticide testing on the cranberries in the 2008 Crop.  Trial Transcript p. 262; Evidence-145-208;[3] Sullivan Dep. p.6-7.

      a.     Nathan Paske was Covance's manager of study direction for nutritional chemistry and food safety.  He holds a Bachelor of Science in biology from the University of Wisconsin-Stevens Point.  Trial Transcript p. 220-21.  Mr. Paske was the former supervisor of nutritional chemistry and food safety at Covance, a position he held for ten years, in which he would manage Covance's laboratory, review data, authorize data and sample analysis, perform quality control functions, personally conduct tests on samples and supervise Covance employees, such as Thomas Beck.  Trial Transcript p. 221-22.

      b.     Thomas Beck was a research associate with Covance. Deposition of Thomas Beck, dated September 9, 2011 ("Beck Dep.") p. 7-8.  Mr. Beck worked in the Covance laboratory conducting sample analysis, was familiar with Covance's quality control and standard operating procedures, and had experience conducting sample testing, sample calculations and data calculations.  Beck Dep. p. 8-9, 14-15.  Mr. Beck holds

---

[3] All citations to "Evidence-___" refer to the Bates Labeled exhibits in evidence previously provided to the Court.

a Bachelor of Science degree in microbiology from the University of Wisconsin-Madison. Beck Dep. p.15.

              c.      Darryl Sullivan was Covance's director of scientific and regulatory affairs at Covance, and was responsible for Covance's scientific integrity for nutritional chemistry and food safety. Sullivan Dep. p. 5-6. Mr. Sullivan had been employed by Covance for more than eight years and personally performed nutrient and residue testing. Sullivan Dep. p. 8-10. Mr. Sullivan holds a Bachelor of Science degree in biochemistry and biological conversation from the University of Wisconsin-Madison. Sullivan Dep. p. 11.

## B.      Cranberries and the 2008 Crop.

              5.      Cranberries are grown on vines in bogs, marshes or beds, which are fields surrounded by a perimeter dyke. Trial Transcript p. 31, 126-27. Jensen owns multiple marshes or bogs where it grows cranberries. Trial Transcript p. 31. In 2008, Jensen grew cranberries at three of its bogs - Jensen Cranberry Bogs ("JCB"), Castle Rock and North Haven. Trial Transcript p. 30. Cranberries are measured in barrels, with one barrel equaling 100 pounds of cranberries. Trial Transcript p. 53. In 2008, Jensen's three bogs produced a total of 67,500 barrels (or 6,750,000 pounds) of cranberries (the "2008 Crop"). Trial Transcript p. 103.

              6.      Cranberry season begins in April or May of each year. Trial Transcript p. 33. In late May, early June of each year, hooks and blossom grow on the terminal bud of the cranberry vines that was set the previous year. Trial Transcript p. 33. If the blossom is pollinated properly, it will become a cranberry. Trial Transcript p. 33.

After a couple of months, the cranberry will ripen and will be harvested in October of each year. Trial Transcript p. 33.

## C.    The Contract and Payments.

7.    In September 2008, Jensen and Alpine entered into an agreement, where Jensen agreed to sell its entire 2008 Crop to Alpine (the "Contract"). Trial Transcript p. 43-44; Evidence-001-007. Jensen was not certain who approached whom about entering into the Contract. Trial Transcript p. 147.

8.    The Contract was signed approximately two to three weeks before Jensen began harvesting the 2008 Crop. Trial Transcript p. 148. Jonathan Smith, on behalf of Alpine, signed the Contract on September 22, 2008. Trial Transcript p. 255; Evidence-007. Gary Jensen, on behalf of Jensen, signed the Contract on September 24, 2008. Trial Transcript p. 255; Evidence-007. Prior to signing the Contract, Jensen reviewed the Contract and modified page four of the Contract. Trial Transcript p. 46; Evidence-004.

9.    The Contract required that Jensen "grow the highest quality fruit based on customer needs to the best of [Jensen's] ability." Evidence-001. Jensen further "represents, warrants and agrees that all cranberries delivered pursuant to this Agreement are and shall have been grown and delivered in compliance with all federal, state and local laws, rules and regulations, including, without limitation, the Pure Food and Drug Act, the Food, Drug and Cosmetic Act, the Fair Packaging and Labeling Act, the Federal Insecticide, Fungicide and Rodenticide Act (the "FIFR Act") and any application [sic] U.S. Food Drug Administration and U.S. Department of Agriculture guidelines and regulations, are fit for human consumption and for sale in interstate commerce, and are not

5

adulterated." Evidence-003. If Jensen breaches this provision, the Contract states that "Alpine may refuse to accept delivery of all or any portion of the cranberries." Evidence-004.

10.    The Contract provides that "[Jensen] shall defend, indemnify and hold Alpine harmless from and against any and all liability, loss, damage, cost or expense suffered or incurred by Alpine (including reasonable attorneys' fees) arising out of the breach of [Jensen's] representations, warranties and agreements herein." Evidence-003.

11.    The Contract further provided that "[t]itle to all cranberries purchased by Alpine from [Jensen] shall pass to Alpine upon the unloading of the cranberries at Alpine's receiving station," Evidence-002, and that Jensen shall not sell any cranberries contracted with Alpine to any other party without Alpine's written consent. Evidence-001.

12.    Alpine agreed to pay $1.00 per pound for the 2008 Crop, less deductions for moisture, rot, debris and CMC and WCB assessments, Evidence-002; however, the "price paid to [Jensen] is based on the marketable Quality Fruit that is received by Alpine and not on the gross load weights that are delivered to the Alpine cleaning site." Evidence-002.

13.    Alpine paid Jensen a total of One Million Five Hundred Thousand Dollars ($1,500,000) under the Contract for 1,500,000 pounds of cranberries. Trial Transcript p. 61; Evidence-008, 017. These payments consisted of: $600,000 (received by Jensen on December 13, 2008, deposited on December 15, 2008); $600,000 (received by Jensen on January 24, 2009, deposited on January 26, 2009); and $300,000 (received by Jensen on February 23, 2009, deposited on February 24, 2009). Trial Transcript p. 52-53; Evidence-008, 017.

14.     In February 2009, Jonathan Smith of Alpine contacted Gary Jensen to request that Alpine's third payment under the Contract be split into two payment of Three Hundred Thousand Dollars ($300,000) each, because of the low cash flow Alpine experiences at the beginning of each year.  Jensen agreed.  Trial Transcript p. 62-63, 275-76; Sohns Dep. p. 22-23.  Alpine had a $4 million line of credit to cover February 2009's payment.  Trial Transcript p. 267-77; Sohns Dep. p. 21. Jensen did not consider Alpine to be in breach of the Contract in late February 2009.  Trial Transcript p. 138.

15.     The Contract provides that if payments are not received when due under the Contract (see Schedule A), Alpine shall be given ten days after writing notification to remedy the defect or Jensen has the option to void the Contract.  Evidence-002, 006.  Jensen did not notify Alpine in writing of any failure to make payments when due under the Contract.  Trial Transcript p. 138.

**D.     Acephate, Pesticide Logs and Label Instructions.**

16.     Acephate is an orgranophosphate insecticide used to kill insects, including cranberry fruit worms.  Trial Transcript p. 35, 73, 207.  There are several brands of acephate, but Jensen uses the brand of acephate called Orthene 97.  Trial Transcript p. 35.

17.     Acephate was applied by Jensen to the 2008 Crop using a boom sprayer that reaches out and stretches across the cranberries and is applied by licensed applicators.  Trial Transcript p. 35-36.  On July 22, 2008, Gary Jensen, a licensed applicator, applied acephate and diazinon (another pesticide) to the 2008 Crop located at the JCB bog.  Trial Transcript p. 36, 38-39; Evidence-214, 217.  On the same day, July 22, 2008, Jensen's employee, Terry Hutchins, also a licensed applicator, applied acephate and

7

diazinon to the 2008 Crop at the Castle Rock bog. Trial Transcript p. 36, 40; Evidence-216, 218. Gary Jensen provided Jensen's employee with the acephate to use at Castle Rock along with a recipe the employee should follow, but Gary Jensen was not present when the acephate was applied to the Castle Rock bog. Trial Transcript p. 40, 142. Terry Hutchins' employment with Jensen was subsequently terminated. Trial Transcript p. 145-46. No acephate was applied to the northern part of the North Haven bog. Trial Transcript p. 39-40, 126; Evidence-215.

18.     Gary Jensen testified at his deposition in 2011 that he tank mixed the acephate (Orthene 97) with diazinon together before applying the pesticides to the 2008 Crop. Evidence-210-213. Specifically, Gary Jensen tank mixed the acephate and diazinon together and applied it to the JCB bog and he instructed his employee Terry Hutchins how to mix and apply the acephate/diazinon mixture to the Castle Rock bog. Evidence-211-12.

19.     A pre-harvest interval (or "PHI") for a pesticide is the minimum period of time required between an application of a particular pesticide and the commencement of harvest. Trial Transcript p. 36-37. The PHI allows pesticides to dissipate naturally throughout the growing season, and it is necessary to allow the pesticides time to dissipate while the cranberry is still on the vine (i.e. before harvest begins). Trial Transcript p. 37.

For the 2008 Crop, the PHI for acephate was 75 days. Trial Transcript p. 37. Normally, and as per the manufacturer of Orthene 97, the PHI for acephate is 90 days. Trial Transcript p. 123, 148-49. The 75 day PHI is based on a special state local needs label issued for Wisconsin which allowed growers to apply acephate after the cranberry blooms ("Wisconsin Label"). Trial Transcript p. 122, 149; Evidence-262-63. The

special local needs label is part of Wisconsin state law. Trial Transcript p. 122; Evidence-262-63.

20.     The Wisconsin Label for Orthene 97 which was in effect pursuant to the special local needs law specifically states: "[d]o not tank mix Orthene 97 with other organophosphate insecticides, such as diazinon, when making application post-bloom." Evidence-262.

21.     Jensen was aware of and in possession of the Wisconsin Label. Trial Transcript p. 122-23, 184; Evidence-262-63. This Wisconsin Label was required to be in the possession of, and maintained by, anyone who applied Orthene 97. Trial Transcript p. 185; Evidence-263. Although Jensen never produced the Wisconsin Label during discovery, Gary Jensen claims to have had the Wisconsin Label in his possession since 2008. Trial Transcript p. 185, 205. Only after Jensen finally produced the Wisconsin Label during trial did he contradict his 2011 deposition testimony and claim that he did not tank mix acephate and diazinon before applying them to the 2008 Crop; however, the Court finds that testimony not credible and unworthy of belief.

22.     Jensen maintained a Pesticide Field Worksheet, which is a record of chemicals and pesticides applied to the 2008 Crop. Trial Transcript p. 37, 141; Evidence-214-16. After the Contract was signed, Jensen provided Alpine with an Agrochemical Log that Gary Jensen filled out using the information taken from Jensen's Pesticide Field Worksheet. Trial Transcript p. 46, 57, 141; Evidence-217-18. The Agrochemical Log indicated a PHI for acephate of 75 days. It did not indicate that Jensen had tank mixed the acephate and diazinon and Gary Jensen did not inform Alpine that he had tank mixed the two pesticides. Evidence-217-18. Alpine reviewed the Agrochemical Log that Jensen

9

provided to Alpine. Trial Transcript p. 58, 182, 205, 325; Evidence-217-18. Jonathan

Smith and Gary Jensen specifically discussed the Agrochemical Log: Mr. Smith indicated

from the Agrochemical Log that it appeared that the PHI and pesticide concentrations had

been met and Alpine did not have any concerns about the Agrochemical Log. Trial

Transcript p. 58, 182, 205, 325; Evidence-217-18.

**E.      Delivery of the 2008 Crop and Covance Testing.**

   23. Jensen began harvesting the 2008 Crop on October 12, 2008, eighty-

two days after the acephate and diazinon had been applied. Trial Transcript p. 53;

Evidence-019. It takes approximately two weeks for Jensen to harvest its entire crop. Trial

Transcript p. 34. Jensen delivered the 2008 Crop to Alpine in 126 truckloads between

October 12, 2008 and October 27, 2008. Trial Transcript p. 53-54; Evidence-019-143.

Jensen did not exercise its right under the Contract to have a representative present at the

time of delivery and weighing at Alpine's receiving station. Trial Transcript p. 147.

   24. After Jensen delivers a cranberry crop to a receiving station (like

Alpine's), the cranberries are cleaned and processed, and then the cranberries are delivered

to freezers. Trial Transcript p. 34. The cranberries are frozen right away or else the

cranberries will rot. Trial Transcript p. 34.

   25. Jensen is unaware of whether it is customary for a cranberry handler

or processor (like Alpine) to conduct pesticide testing on site, after delivery of cranberries.

Trial Transcript p. 66. Jensen was not aware of any cranberry handler or processor (like

Alpine) having their own acephate testing lab on-site. Trial Transcript p. 124. Prior to

2009, Jensen is unaware of any time a cranberry processor performed pesticide testing on

Jensen's cranberries prior to harvest. Trial Transcript p. 203-04. Jensen did not perform any pesticide testing before delivering the 2008 Crop to Alpine.

26.     At the time of delivery, Alpine took a cranberry sample from each delivery truck, which consisted of two or three five gallon buckets of cranberries. Trial Transcript p. 259, 269. From each sample, Alpine put one portion of the sample into a box for long-term storage as a "retain" and the remainder was separated and sorted to review for rot, color and debris, all of which affect the amount the grower is ultimately paid. Trial Transcript p. 259-60. The "retain" samples were stored in Alpine's on-site freezers. Trial Transcript p. 260.

27.     After delivery, Alpine cleaned the 2008 Crop, put it into bins, labeled the bins, and shipped the 2008 Crop to refrigerated storage facilities. Trial Transcript p. 257-59.

28.     Alpine has pesticide testing performed based on customer requests, requests which primarily come from European buyers. Trial Transcript p. 262. Alpine sold a lot of cranberries to European buyers: traditionally fifty percent of Alpine's cranberries were sold to European buyers. Trial Transcript p. 262, 291. If a customer requested a pesticide residue analysis, Alpine would provide them with the pesticide residue reports prior to shipping the final cranberry product to the customer. Trial Transcript p. 268.

29.     In 2008, a broker, Glenn Ennis of PJ Impex, called and informed Alpine that Europeans would be looking for pesticide residue reports whenever they purchased cranberries for the year. Trial Transcript p. 263, 267. Therefore, in 2008, Alpine took samples from cranberries delivered by all of its growers (including Jensen) and

11

sent them for pesticide testing so that Alpine would have the reports readily available in the growers' files. Trial Transcript p. 291. There were no particular buyers lined up by the broker at the time. Trial Transcript p. 293-94.

30.     Alpine sent in cranberry samples from its best growers, including Jensen, and the testing was performed by Covance. Trial Transcript p. 291; Evidence-208. The testing included analyzing the amount of acephate residue, which was same test for both the United States and Europe, although there are different standards (i.e., different acceptable levels of residue). Trial Transcript p. 297. In 2008, under the Federal Insecticide, Fungicide and Rodenticide Act, the United States federal tolerance for acephate for raw cranberries was 500 parts per billion, Trial Transcript p. 37, 54-55, 217, 298; Reitz Dep. 112-13, while the European tolerance level was 20 parts per billion. Trial Testimony p. 298.

31.     When Covance takes a cranberry sample from a customer to test for pesticide residue, all of the cranberries in the sample do not necessarily have identical pesticide residues. Trial Transcript p. 236. For example, if an acephate residue test showed results of 100 parts per billion, some of the cranberries may have residue of more than 100 parts per billion and others may have less. Trial Transcript p. 236. Covance confirmed it was possible to have one test show acephate levels above 500 parts per billion and another test show acephate levels below 100 parts per billion on two tests taken from the same sample of cranberries. Trial Transcript p. 240. However, if all the cranberries had pesticide levels of between five and twenty parts per billion, there is no way the test results would show acephate levels of 100 parts per billion. Trial Transcript p. 238.

12

32.     In Covance's experience, two portions of the same sample could have results that had a difference of greater than one hundred fifty percent. Trial Transcript p. 243. The highest level of acephate residue Covance has detected on raw cranberries is 5,000 parts per billion. Trial Transcript p. 242-43.

33.     On November 24, 2008, Alpine submitted a sample of cranberries for pesticide testing from the 2008 Crop along with samples from Alpine's other growers. Trial Transcript p. 289-90; Evidence-145, 208. The sample from the 2008 Crop was taken from Jensen truck number 2834, as indicated on the bill of lading ticket filled out by Jensen. Trial Transcript p. 111-14, 289-90; Evidence-100,145.

34.     Covance's analysis indicated the November 24, 2008 sample from the 2008 Crop had acephate residue levels of 1,489 parts per billion, Evidence-145, 151, 153, Sullivan Dep. p. 113, which is almost three times the allowable Federal tolerance. Covance confirmed that for this sample, at least one or more of the cranberries in that sample had an acephate residue level of at least 1,489 parts per billion. Trial Transcript p. 239; Evidence-145-55; Sullivan Dep. p. 111, 113. Jensen has no evidence that the November 2008 sample of the 2008 Crop was altered by Alpine, did not come from the 2008 Crop or that Alpine engaged in any conspiracy or scheme to alter the test results. Trial Transcript p. 108, 117-18.

35.     The November 24, 2008 Covance test results were mailed to Alpine around December 4, 2008. Trial Transcript p. 290. After receipt, Mr. Smith did not review the test results but gave them to Linda White, Alpine's quality manager, to put them in the growers' files. Trial Transcript p. 290. Mr. Smith did not review the test results because he did not expect there to be a residue problem - the Agrochemical Logs provided to Alpine by

13

Jensen indicated an appropriate PHI for acephate of 75 days. They did not indicate, however, that acephate and diazinon had been tank mixed contrary to the Wisconsin Label. Trial Transcript p. 290-91. Mr. Smith intended to pull the test results out of the growers' files whenever Alpine needed to send the documentation pursuant to a customer's request. Trial Transcript p. 291.

36.     During the second or third week of February 2009, Gary Jensen, Jonathan Smith and David Moodie (of Alpine) attended a Cranberry Marketing Convention in Washington, D.C. Trial Transcript p. 135-36, 279.

37.     During the Cranberry Marketing Convention, Gary Jensen approached Kevin Sanvidge of Cliffstar about purchasing the 2008 Crop. Trial Transcript p. 136; Sanvidge Dep. p. 29; Reitz Dep. p. 26-27. Jensen did not consider Alpine to be in breach of the Contract in late February 2009. Trial Transcript p. 138.

38.     At the Cranberry Marketing Convention, Mr. Smith learned there were new European standards for acceptable levels of acephate. Trial Transcript p. 323. Mr. Smith wanted to review whether he would have any issues with the new standards and, therefore, upon returning from the Cranberry Marketing Convention, he reviewed the Covance pesticide test results for all Alpine's growers (not just Jensen). Trial Transcript p. 288, 294, 304, 323. Upon review, Mr. Smith discovered that all of Alpine's growers who applied acephate had residue detected on their fruit. Trial Transcript p. 316-37. Mr. Smith then immediately notified Gary Jensen that the 2008 Crop was over legal tolerance for acephate and that Alpine could not use the Crop that had been sprayed with acephate. Trial Transcript p. 64, 125, 137, 294, 317. This conversation occurred prior to Alpine conducting a second round of testing in March 2009. Trial Transcript p. 139-40.

39.     After being informed of the acephate issue, Gary Jensen assured Mr. Smith that Jensen had "grown the crop according to all legal laws and label instructions regarding acephate." Trial Transcript p. 64. Gary Jensen also stated that Jensen would not return Alpine's $1.5 million payment "until we got to the bottom of this pesticide residue issue." Trial Transcript p. 127.

40.     Alpine agreed to do further testing on the 2008 Crop. Trial Transcript p. 64, 294-95; Evidence-156-70. Two samples were taken from the retains of the 2008 Crop kept in Alpine's on-site freezer that had not passed through the processing plant, and at least one sample was taken from a bulk tote that had been processed through Alpine's finished product line. Trial Testimony p. 300, 313-14.

41.     Of the two samples Alpine submitted to Covance for testing on March 12, 2009, Covance's analysis indicated the samples submitted for the 2008 Crop had acephate residue levels of 1,180 and 1,520 parts per billion, Evidence-156, 158, 160, 163, 164-65, 167, Sullivan Dep. p. 122-23, 125-26, which were also well in excess of the allowable Federal levels. Trial Transcript p. 64-65, 140, 295; Evidence-156, 158, 160, 163, 164-65, 167.

42.     Covance confirmed that for the two March 12, 2009 samples, at least one or more of the cranberries in that sample had an acephate residue level of at least 1,180 and 1,520 parts per billion. Trial Transcript p. 239-40; Evidence-163,156. Jensen has no evidence that the March 12, 2009 samples of the 2008 Crop was altered by Alpine, did not come from the 2008 Crop or that Alpine engaged in any conspiracy or scheme to alter the test results. Trial Transcript p. 108, 117-18.

43.     Jensen understood that if Jensen's cranberries did not meet the 500 parts per billion Federal standard, Jensen could not sell them to a cranberry handler.  Trial Transcript p. 42.

44.     After Alpine notified Jensen of the March 2009 tests, Jonathan Smith recommended that a concentrator might be able to utilize the 2008 Crop because the cranberries could be blended with other growers' cranberries and blending and concentrating might remove some of the acephate.  Trial Transcript p. 140-41.  Based on Mr. Smith's experience, concentrators are not concerned about incoming pesticide residues, but instead were focused on the outgoing product.  Trial Transcript p. 328-28.

45.     Gary Jensen informed Mr. Smith that Jensen would sell the cranberries to Cliffstar, and Alpine did not object.  Trial Transcript p. 279, 280.  Cliffstar agreed to buy Jensen's cranberries in March or April 2009.  Reitz Dep. 33.

46.     Over five months after delivering the 2008 Crop to Alpine, on April 8, 2009, with Alpine's consent, Gary Jensen performed testing on six samples from the 2008 Crop taken from Millard public freezers, located in Geneva, Wisconsin.  Trial Transcript p. 73-74, 297.  Gary Jensen drove the six samples to Covance for testing, located approximately one hour away.  Trial Transcript p. 77.  The April 8, 2009 Covance test results for these samples showed acephate residue that varied between 61 and 179 parts per billion.  Evidence-172-88.

47.     On April 22, 2009, Alpine sent Jensen an email stating they would keep the Northern Marsh cranberries (because they were not sprayed with acephate according to the Agrochemical Logs).  Trial Transcript p.174-75; Evidence-219-23.

16

48.     However, the next day, on April 23, 2008, Jensen entered into a cranberry marketing agreement with Cliffstar where Jensen purported to sell the entire 2008 Crop to Cliffstar ("Cliffstar Agreement"). Evidence-009-16. In the Cliffstar Agreement, Jensen represented and warranted to Cliffstar "as of the date of this agreement . . . that (a) [Jensen] has the right to sell the cranberries pursuant to the terms of this Agreement and has good and marketable title to all of the Cranberries" as well as the execution of the Agreement will not "constitute a violation of . . . (ii) any agreement, instrument, understanding or commitment to which [Jensen] is bound. . . ." Evidence-010. Cliffstar agreed that Jensen was supposed to have "clean title" to the 2008 Crop Jensen was selling to Cliffstar. Reitz Dep. 153-54. Cliffstar paid Jensen $0.62 per pound for the cranberries. Trial Transcript p. 105; Evidence-018.

49.     On April 23, 2009, Cliffstar sent concentrate samples (not frozen whole cranberries) from the 2008 Crop to Covance for testing. Reitz Dep. p. 103, 105, 108-09. These April 23, 2009 Covance test results showed acephate levels of 3,880; 2,260; and 4,520 parts per billion. Evidence-190-94; Bell Dep. p. 44-45. Cliffstar relayed these results to Gary Jensen. Reitz Dep. p. 110-11. In June 2009, Gary Jensen questioned why the concentrate samples were so high; Cliffstar did not find out why the samples tested so high for acephate. Reitz Dep. 188.

50.     In mid-May 2009, Jensen (Gary Jensen) and Cliffstar (Andy Reitz) took possession of the retain samples from Alpine's on-site freezer because Cliffstar had by now purchased the cranberries in the 2008 Crop. Trial Transcript p. 296. On May 21, 2009, Gary Jensen conducted additional testing from six samples of the 2008 Crop contained in Alpine's on-site freezers. Trial Testimony p. 88-89. He drove them to

17

Covance for testing approximately two hours away.  Trial Testimony p. 89. The May 21,
2009 Covance test results for these samples showed acephate residue that varied between
less than 40 to 50 parts per billion.  Evidence-196-206.  These tests were conducted
approximately seven months after delivery of the 2008 Crop.

   51. Jensen was notified by Covance that there were some minimal
calculation errors in the April 2009 test results for the samples Covance tested at Jensen's
request.  Trial Transcript p. 158.  Covance did not have any calculation errors regarding the
November 24, 2008 or the March 12, 2009 tests it performed for Alpine on the 2008 Crop.
Trial Transcript p. 235; Evidence-145-69.

   52. Covance has stood by the correctness of all of its testing on the 2008
Crop.  Trial Testimony p. 158-59. Mr. Paske confirmed that acephate can evaporate off a
frozen cranberry, a cranberry that was frozen and then thawed, as well as a cranberry that
was not frozen.  Trial Transcript p. 233-34.  Mr. Paske explained that acephate is a volatile
compound and that if the freezing temperature gets low enough or is exposed to that type
of environment for a long enough period of time, it will evaporate.  Trial Transcript p. 241-
42.  Mr. Sullivan stated that the conditions of thawing a frozen cranberry would determine
whether pesticide residues would evaporate from the cranberry.  Sullivan Dep. 113.

   53. Jensen acknowledges that there may be differences in the amount of
acephate residue from the first bog harvested to the last bog harvested.  Trial Transcript
p. 145.  Jensen is unaware of how acephate residue on cranberries is affected by freezing,
thawing, washing or processing.  Trial Transcript p. 151.

   54. After Jensen refused to return Alpine's payments of $1.5 million
dollars and told Alpine it would have to keep 1.5 million pounds of fruit, Alpine sold

1.5 million pounds of the 2008 Crop to Cliffstar, because Alpine could not use the fruit. Trial Transcript p. 283-85; Sanvidge Dep. p. 89.   Alpine transferred the remaining 2008 Crop to Jensen (approximately 5.2 million pounds), who then sold the remaining amount of the 2008 Crop to Cliffstar.   Trial Transcript p. 326; Sohns Dep. p. 27.   Cliffstar paid $0.62 per pound for the 2008 Crop in the condition it was delivered to Alpine.   Evidence-014.

        55.     Jensen claims that besides a June 13, 2009 email, Alpine never explained why it transferred the entire 2008 Crop to Cliffstar.   Trial Testimony p. 201; Evidence-213.   The June 13, 2009 email, however, states that Alpine transferred the cranberries to Cliffstar at Jensen's direction.   Evidence-213.

        56.     There has been no evidence submitted demonstrating the Federal tolerance for acephate for cranberry juice.   The three Cliffstar representative deposed in this action - Kevin Sanvidge, Andrew Reitz and Randy Bell - were not aware of whether the 500 parts per billion tolerance applied to cranberry juice.   Trial Transcript p. 217; Sanvidge Dep. p. 106-07; Reitz Dep. p. 138; Bell Dep. p. 24 ("Q: Are there legal tolerances for cranberry juice? A: I don't think so.").

        57.     Cliffstar had purchased cranberries before with acephate levels above legal tolerance, performed more tests, and, in their experience, the subsequent tests showed that the cranberries no longer had high levels of acephate.   Reitz Dep. 135.   Blending cranberries from different growers could dilute the level of pesticide residue.   Reitz Dep. 137-38.

58.    Although Cliffstar processed the 2008 Crop into juice and concentrate, there is no evidence that juice or concentrate was every sold by Cliffstar or consumed by anyone.  Bell Dep. p. 20-21.

## PROPOSED CONCLUSIONS OF LAW

1.    The Court concludes that the Contract is between two Wisconsin parties and is governed by Wisconsin law.

2.    Under Wisconsin law, goods, such as cranberries, conform with a contract when "they are in accordance with the obligations under the contract." Wis. Stat. Ann. § 402.106(2) (West 2015).

3.    The Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") requires that pesticides be applied in conformity with the pesticide's label. *See* FIFRA, 7 U.S.C. § 136j(a)(2) (2015) ("It shall be unlawful for any person . . . (G) to use any registered pesticide in a manner inconsistent with its labeling.").  Wisconsin state law also requires that pesticide be applied in conformity with the pesticide's label. *See* Wis. Stat. Ann. § 94.70(3) (West 2015) ("No person may . . . (g) Use any pesticide in a manner inconsistent with its labeling except as authorized by the department."); Wis. Admin. Code ATCP § 29.50 (2015) ("No person may do any of the following: (a) Use or direct the use of a pesticide in a negligent manner, or in a manner inconsistent with the pesticide label.").  Furthermore, failure to follow Wisconsin law regarding the use and application of pesticides (including following the directions on a pesticide's label) constitutes "negligence per se." *Bennett v. Larsen Co.*, 348 N.W.2d 540, 550-51 (Wis. 1984).  As discussed above, by tank mixing the acephate and diazinon, Jensen did not comply with the Wisconsin Label for acephate when applying the acephate to the 2008 Crop.  Because the 2008 Crop was not

"grown and delivered in compliance with all federal, state and local laws, rules and regulations," including FIFRA and Wisconsin state law as required under the Contract, the 2008 Crop were not in conformity with the Contract.

4.      Under Wisconsin law, a buyer of nonconforming goods may revoke acceptance of non-conforming goods <u>and</u> seek damages for breach of contract. *See* Wis. Stat. Ann. § 402.608 cmt. 1 (West 2015) ("the buyer is no longer required to elect between revocation of acceptance and recovery of damages for breach. Both are now available to him.").

5.      A buyer may seek damages for accepted goods under a theory of breach of contract or warranty. Wis. Stat. Ann. § 402.714. Under the Contract, Jensen expressly agreed to grow and deliver the 2008 Crop "in compliance with all federal, state and local laws, rules and regulations," including FIFRA and Wisconsin state law, that the 2008 Crop would be fit for human consumption, sale in interstate commerce and would not be adulterated. Evidence-003. As stated above, Jensen did not grow and deliver the 2008 Crop in compliance with all federal and state laws, which Jensen knew or should have known at the time it entered into the Contract with Alpine. Nor did Jensen deliver cranberries that were fit for human consumption or were not adulterated. Jensen concedes that if the acephate levels exceeded 500 parts per billion, that would violate the portion of the Contract that states the 2008 Crop must be "fit for human consumption and for sale in interstate commerce and not adulterated." Trial Transcript p. 123-24. The only test result closest to delivery of the 2008 Crop - the November 24, 2008 Covance report - shows that the acephate levels were 1,489 parts per billion, almost three times the federal tolerance level. Evidence-145. There has been no credible evidence (expert or otherwise)

21

demonstrating that the results of the Covance test were false or in any way inaccurate. This defect in the 2008 Crop was substantial. *See Century Dodge-Chrysler v. Koxlien*, 306 N.W.2d 307 (Wis. Ct. App. 1981) (four defects in a vehicle, including one the court considered "important," were construed as substantially impairing the value of the vehicle). Jensen has not provided any evidence that the 2008 Crop conformed with the Contract at the time of delivery and, therefore, Alpine is entitled to damages for Jensen's breach of the Contract, such damages constituting return of the $1.5 million Alpine paid to Jensen.

6.     As a separate and independent remedy, a buyer of goods may also revoke acceptance of a lot or commercial unit "whose nonconformity substantially impairs its value to the buyer if he has accepted it . . . (b) without discovery of such non-conformity, if the buyer's acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." Wis. Stat. Ann. § 402.608. Knowledge of the buyer's business or intention for the goods is irrelevant because a substantial impairment in value occurs the "non-conformity is such as will in fact cause a substantial impairment of value to the buyer though the seller had no advanced knowledge as to the buyer's particular circumstances." Wis. Stat. Ann. § 402.608 cmt. 2 (West 2015).

7.     "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it. . . ." Wis. Stat. Ann. § 402.608(2) (West 2015). "Reasonable time" under the U.C.C. "depends on the nature, purpose, and circumstances of the action." Wis. Stat. Ann. § 401.205 (West 2015); *see also, Badger Prod. Co., Inc. v. Prelude Foods Intern., Inc.*, 387 N.W.2d 98 (Wis. Ct. App. 1986) (revocation of acceptance after 49 days was reasonable under the circumstances); *Troutman v. Pierce, Inc.*, 402 N.W.2d 920 (N.D. 1987) (delay of eighteen months in giving notice of

revocation of acceptance of a mobile home was timely); *RIJ Pharm. Corp. v. Ivax Pharm., Inc.*, 322 F. Supp. 2d 406, 414 (S.D.N.Y. 2004) (the reasonableness of a three month delay in revoking acceptance of over-the-counter pharmaceuticals was a question for the jury).

8.      Here, neither party conducted pesticide testing of the 2008 Crop before Jensen delivered the cranberries to Alpine. Jensen provided Alpine with Agrochemical Logs that demonstrate the PHI for the pesticides applied to the 2008 Crop were met and Jensen alleges he discussed this with Alpine. There is no evidence that acephate residue is detectable in any way other than through pesticide testing. Therefore, Alpine's "acceptance" of the 2008 Crop was reasonably induced because of the difficulty of discovering the non-conformity. *See, e.g., In re H.P. Tool Mfg. Corp.*, 37 B.R. 885, (E.D. Pa. 1984).

9.      Approximately one month after delivery, on November 24, 2008, Alpine sent one sample of the 2008 Crop for pesticide testing. After receiving the results from Covance the beginning of December 2008, Alpine did not review the results. Although the Alpine sent in testing for multiple growers, Alpine did not have buyers lined up who would be requiring the pesticide testing reports. Alpine first reviewed the results after returning from a Cranberry Marketing Convention, which took place mid-February 2009. After reviewing the results of the November 24, 2008 test, Jonathan Smith notified Gary Jensen of the acephate issue. Gary Jensen assured Alpine that he had "grown the crop according to all legal laws and label instructions regarding acephate," Trial Transcript p. 64, which was not true. The parties then engaged in additional testing with widely varying results.

10.   "[W]hat constitutes a reasonable time [to revoke acceptance] is a question of fact for the factfinder." *Viking Packaging Techs., Inc. v. Vassallo Foods, Inc.*, 804 N.W.2d 507, 516 (Wis. 2011).  Under these circumstances, although Alpine was in possession of the Covance report in December 2008 reflecting high levels of acephate on the 2008 Crop, at the same time, Jensen should have been aware that Gary Jensen had not applied the Orthene 97 according to the Wisconsin Label in July 2008, yet allowed Jensen to represent to Alpine that it had.  There was no change in status of the 2008 Crop from December 2008 through February 2009.  Alpine was not using the 2008 Crop during that time, but was continuing to pay under the Contract.  When Alpine reviewed the test results, it immediately notified Jensen of the problem.  *See Paulson v. Olson Implement Co.*, 319 N.W.2d 855, 862 (Wis. 1982) (two month delay in giving notice was reasonable); *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513 (Wis. 1978) (fourteen months delay in revocation of acceptance of a defective automobile was not unreasonable under the circumstances); *Reimer Meat v. Burroughs*, 293 N.W.2d 184 (Wis. 1980) (eight month delay in revoking acceptance of a computer that never became fully operational was reasonable under the circumstances).  Moreover, the purpose of reasonable notice was met here - it provided Jensen with an opportunity to review and cure the problem and to mitigate damages.  Both parties conducted several rounds of testing while the 2008 Crop still remained frozen, continued to negotiate and eventually Jensen resold the 2008 Crop to Cliffstar.  *See Badger Prod. Co., Inc.*, 387 N.W.2d at 105 (revocation of acceptance 49 days after delivery was reasonable where the food product remained frozen and the parties were discussing a resolution of the problem).  The cases cited by Jensen are distinguishable. Both cases involve buyers of products who had direct knowledge of the alleged defect

and/or continued to use the products anyways, and neither case involves a seller violating federal and state law or having, at best, failed to disclose a material fact at the time of contracting. *Tegen v. Chapin*, 187 N.W. 185 (Wis. 1922); *J.B. Bradford Piano Co. v. Baal*, 164 N.W. 822 (Wis. 1917). Under the circumstances of this case, the Court finds that Alpine's notification to Jensen of the acephate levels was reasonable. Therefore, Alpine is entitled to damages for revocation of its acceptance of the 2008 Crop.

       11.    Under either a breach of contract/warranty theory or revocation of acceptance of the 2008 Crop, Alpine is entitled to the return of its $1.5 million payment to Jensen, Wis. Stat. Ann. §§ 402.711, 402.714, less the amount paid into Court by Cliffstar (when paid to Alpine) plus interest and reasonable attorneys' fees. Evidence-003.

       12.    The Court further finds that Jensen has not met its burden in asserting Alpine breached the Contract. First, as discussed above, Jensen cannot establish that it complied with the Contract (i.e. grew the Crop in compliance with Federal and State law and delivered conforming goods). Secondly, Jensen has not established the correct purchase price. The Contract specifically states that the purchase price is "based on the marketable Quality Fruit that is received by Alpine and not on gross load weights that are delivered to the Alpine cleaning station." Evidence-002. While "Quality Fruit" is not defined in the Contract, Jensen has not provided evidence that any of the 2008 Crop constituted "Quality Fruit" when delivered to Alpine. Lastly, Jensen never notified Alpine in writing that Alpine breached the Contract, pursuant to paragraph 4 of the Contract, and did not provide Alpine an opportunity to cure any defect. Trial Transcript p. 138-39, 155; Evidence-002.

Dated:  Buffalo, New York
        December 4, 2015

PHILLIPS LYTLE LLP


By: /s/ Amanda L. Lowe
        Edward S. Bloomberg
        Amanda L. Lowe
Attorneys for Defendant
*Alpine Foods LLC*
One Canalside
125 Main Street
Buffalo, New York  14203-2887
Telephone No. (716) 847-8400
ebloomberg@phillipslytle.com
alowe@phillipslytle.com


TO:   Hugh Carlin, Esq.
      Trevor M. Torcello, Esq.
      Gross Shuman Brizdle & Gilfillan, P.C.
      Attorneys for Defendant
      *Jensen Cranberry Bogs, Inc.*
      465 Main Street, Suite 600
      Buffalo, New York 14203
      Telephone No. (716) 854-4300
      hcarlin@gross-shuman.com
      ttorcello@gross-shuman.com


Doc #01-2905889.2

26