UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CLIFFSTAR CORPORATION

                          Plaintiff,                 Civil Action No. 09 CV 0690(A)

    v.

ALPINE FOODS, LLC and
JENSEN CRANBERRY BOGS, INC.

                         Defendants

---

**DEFENDANT JENSEN CRANBERRY BOGS, INC.'S
RESPONSE TO DEFENDANT ALPINE FOODS, LLC'S
PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

### I.    OVERVIEW

Defendant, Jensen Cranberry Bogs, Inc. ("Jensen"), submits this response to Defendant

Alpine Foods, LLC's ("Alpine") Proposed Findings of Fact and Conclusions of Law. (Dkt. 275).

Alpine has in some instances misstated evidence and in other instances attempted to fill in the

gaps in the evidence occasioned by its failure to present any live lay or expert testimony.

Notably, Alpine failed to call its key witness, Jonathan Smith, thereby foreclosing the Court's

opportunity to weigh his suspect credibility, particularly under cross examination.  Alpine either

ignores or avoids the burdens of proof, which fall squarely upon its shoulders, and resorts to

conjecture and rank speculation to avoid the consequences of its unreasonable delay in notifying

Jensen of the "over tolerance issue".  In addition, Alpine has utterly failed to meet its burden to

establish any damage on its part.

For the convenience of the Court, each numbered paragraph below is followed, in parenthetical form, by the numbered paragraph of Alpine's Proposed Findings of Fact and Conclusions of Law.

## II.    JENSEN'S RESPONSE TO ALPINE'S PROPOSED FINDINGS OF FACT

### A.    The Parties and Witnesses.

1.    (¶2. a.) Alpine presented no competent evidence at trial in support of its assertion that, at time of trial, Mr. Smith was no longer President of Alpine. Mr. Moody, present in the courtroom during each day of trial, elected not to testify as to Smith's current position with Alpine, or Alpine's reasons for not producing him to testify at trial. As such, the evidence presented at trial reflects Smith as President of Alpine Foods, overseeing its entire operation. (TR 253/6-9).

2.    (¶2. b) Alpine presented no competent evidence at trial in support of its assertion that, at time of trial, Ms. Sohns was no longer employed with Apine in the position of Chief Financial Officer and accountant. As such, the evidence presented reflects Sohns as Alpine's accountant and CFO. (Sohns 6/23-7/10).

### D.    Acephate, Pesticide Logs and Label Instructions.

3.    (¶18-22) Having never taken issue of the manner in which Jensen applied pesticides to the 2008 Crop, the pre-harvest interval ("PHI"), or the accuracy of the agrochemical logs for seven (7) years, Alpine sought to inject confusion and surprise into an issue that is ultimately a non-issue.

4.    First, Alpine sought to suggest, for the first time ever in the case, that the PHI was 90 days rather than 75 days, notwithstanding that its key, but missing, witness never disputed the

fact that the applicable PHI was 75 days.  (TR 182/2-17; 325/7-13; see also, Dkt. 275 at ¶35, pp. 17-18).

5.     Alpine then sought to contest the manner in which the acephate was applied, i.e. whether it was tank mixed or sprayed separately.  Mr. Jensen, when provided with limited labeling instructions suggesting that acephate and diazinon should not have been tank mixed in 2008, testified that he would have followed the label.  (TR 342/24-344/1).  Mr. Jensen is a licensed pesticide applicator and, as such, was required to be re-certified on a regular basis.  (TR 36/3-18).  Further, Mr. Jensen testified that in all his years, Jensen's crop had never tested over tolerance.  (TR 40/19 -41/7).  Alpine offered no evidence to refute the same.

6.     Alpine offered no evidence that "tank mixing" in any way impacted the acephate levels in the 2008 Crop.  In addition to twelve (12) unrefuted test results, Mr. Jensen's testimony, elicited by Alpine and not objected to, made clear the impact of tank mixing was seen as negligible in the cranberry community.

> A. There was a period of time -- I may have been confused with this questioning during this period of time.  There was a period of time when you could mix Diazinon together with acephate in the tank.  Then there was a period of time when you couldn't and then there may be a period of time after that where you can.  There was some issues with tank -- mixing of Diazinon in the tank with acephate that the company who makes the acephate or sells the acephate was concerned with and then there was further testing in the industry that showed that that was a negligible incident and, therefore, changed the label recommendations.

(TR 342/24 – 343/9).

7.     Any confusion on the part of Mr. Jensen in his testimony can clearly be chalked up to the passage of time, and regulations that changed year to year. (TR 342/24-344/1).

8.     (¶18-22) Alpine offered no testimony to contradict or refute Mr. Jensen's testimony.  Nor did Alpine offer expert testimony as to whether tank mixing would in any way

impact the PHI interval or period of time necessary for acephate levels to reduce below the 500 ppb standard.

9.    (¶18-22) Alpine failed, despite the burden of proof levied upon it, to provide any expert testimony concerning the requirements or pesticide application in 2008 and the effect of the misapplication Alpine speculates occurred.  Although competent proof of both factors are necessary to successfully demonstrate a material breach on Jensen's part, Alpine requests the Court find the same by a blind leap of faith.

10.    Further, as discussed below, Alpine, despite its burden of proof, presented no evidence of the damage it suffered as a result of the alleged breach.

**E.    Delivery of the 2008 Crop and Covance Testing.**

11.    (¶25) Mr. Jensen testified unequivocally that "most, if not all", processors test crop in the field.  Although he was unable to recall with certainty whether his crops had been tested in 2007, he did recall that his crops had been tested both before and after the 2008 Crop.  Alpine did not challenge or dispute the breadth of Mr. Jensen's knowledge of the industry, including his lifelong experience in the cranberry-growing industry, and his role on the Cranberry Marketing Committee.  (TR 30-31; TR 147/7-21; TR 203-204).

12.    (¶25) Alpine offered no evidence at trial to contradict its unilateral and absolute right to test Jensen's crop prior to harvest, and, in light of Smith's failure to testify, could offer no explanation as to why it chose not to take advantage of such opportunity.  Alpine offered no evidence to dispute its ability to test the crop while it remained in the field, and obtain results within one (1) week of testing without causing any harm to the 2008 Crop.  (TR 203).  The evidence establishes that the Alpine Contract was signed on September 24, 2008 (Jt. Ex. 1), that

Alpine was provided with the agro-chemical logs on or before September 25, 2008 (TR 56-59), and that harvesting did not begin until approximately October 12, 2008 (TR 154; Ex. 5).

13.    (¶28)  Alpine presented no competent evidence at trial as to the purported European standard, that Jensen knew of the purported European standard concerning pesticide levels, or that Alpine communicated to Jensen its intention to sell the 2008 Crop to European customers.  (TR 121/22-122/3; 159/4-15; 265).  In any event, as aptly noted by the Court, it is only the U.S. standard that is relevant to this matter.  (TR 85, 265, 266).

14.    (¶29)  Alpine presented no competent evidence at trial as to the date on which Glenn Ennis purportedly advised Jonathan Smith that European customers would require a residue testing report.  (TR 263-268).  Again, due to Smith's absence at trial, Alpine asks the Court to engage in speculation to find that the information purportedly received by Smith from Ennis occurred shortly prior to November 24, 2008, (the date Alpine sent out samples) as opposed to Smith being advised of the same by Ennis sometime earlier in 2008, perhaps even prior to harvest of the 2008 Crop.

15.    (¶31)  Alpine does not dispute the accuracy of the results of the twelve (12) tests obtained by Jensen on samples that were indisputably from the 2008 Crop.

16.    (¶33)  Alpine offered no firsthand knowledge as to who selected the initial samples for testing from the 2008 Crop, or how such samples were handled and delivered to Covance.  (TR 269/23-270/8; 289/18-290/6).  Knowing throughout the course of this litigation that Jensen disputed the legitimacy of Alpine's initial sample selection, which was unwitnessed and uncorroborated, Alpine chose to avoid presenting Smith's live testimony at trial and subjecting him to cross-examination in the presence of the Court.

17.    (¶34) Alpine presented no evidence at trial to corroborate Smith's deposition testimony that the purported initial sample from the 2008 Crop was, indeed, from the 2008 Crop. Alpine presented no evidence as to how such sample was handled following its selection through the transport and delivery to Covance.  By Smith's absence, Alpine failed to present evidence that ruled out more probative alternatives that the initial sample was mishandled, mixed up, or mixed in with a sample of the Cool Mist crop.  Each of these alternatives is probable, given the nearly identical results of the Cool Mist sample.  (Jt. Ex. 6 – Cool Mist, 1413 ppb; Jt. Ex. 7 – Jensen, 1489 ppb).  By contrast, Jensen presented undisputed and corroborated evidence which ruled out all doubt as to the origin, integrity and accuracy of each of the twelve (12) samples submitted by Jensen to Covance.  All twelve (12) samples tested under the tolerance level for acephate.

18.    (¶34) Smith's credibility is already suspect, given his concealment of two (2) test results favorable to Jensen that Smith obtained in March of 2009.  (TR 91/23-25; 323/25-324/7)[1]. Moreover, when asked by Gary Jensen if any other grower's crops had tested over tolerance, Smith lied in denying the same.  (TR 68/3-14; 96/8-15).

19.    (¶35) Once again, Alpine attempts to fill in the blanks left by Smith's deliberate non-attendance at trial.  Alpine improperly suggests Smith could not tell from the agrochemical reports, and did not otherwise know, whether Jensen had tank-mixed acephate and diazinon, and if so, whether the same would have created any concern as to the 2008 Crop before he accepted

---

[1] It is noteworthy that, at the time Smith submitted these concealed samples for testing which resulted in favorable results for Jensen, Smith did not submit a sample from Cool Mist, thereby further validating the likely mix-up or mix-in with the purported initial sample from the 2008 Crop.  (TR 323/25-324/7).

delivery.  No such testimony was elicited at Smith's deposition, and the Court should not be

expected to fill in the blanks through speculation.

      20.    By contrast, competent evidence at trial reflects the following:

- Alpine reviewed the agro-chemical logs provided by Jensen to ensure PHI intervals were correct and accepted the crop.  (TR 325/7-13);

- Smith told Jensen he had reviewed the agro-chemical logs and specifically confirmed the concentrations and PHI were correct.  (TR 182/2-17, TR 205/4-7).

- Smith was familiar with the application of pesticides to cranberries, and in some cases oversaw the application of pesticides for cranberry growers. (TR 254/10-20).

- Jensen applied the pesticides in accordance with all labeling.  (TR 64/13-19; TR 342-343).

- Jensen followed applicable regulations permitting Wisconsin growers to apply acephate after cranberry bloom.  (TR 122/13-16).

      21.    (¶42)  As with its initial sample, Alpine provided no evidence to corroborate

Smith's allegation that the second samples he sent to Covance were from the 2008 Crop.  Alpine

presented no evidence at trial as to how such sample was handled following its selection through

transport and delivery to Covance (TR 67/25-68/6; 295/1-15).  Smith could easily have allowed

Gary Jensen an opportunity to witness the selection and delivery of such samples to Covance.

*Id.*  By contrast, Jensen provided Alpine with such an opportunity.   Smith's absence at trial

precluded the Court from assessing his credibility on these issues.

      22.    (¶46)  Smith delayed authorizing Covance to provide Jensen with Alpine's test

results until April 6, 2009 (five months after Smith received the initial results).  (TR 68/22 –

69/10; Ex. 36).  On April 18, 2009 (TR. 82/10-14) two (2) days after being provided with such

test results, Jensen submitted samples to Covance.  (TR 73/6 – 77/21).  Alpine, attempts to

"whipsaw" Jensen by suggesting Jensen did not test the 2008 Crop until nearly six (6) months after delivery notwithstanding it was Alpine's actions and inactions which created the delay.

23.    (¶¶47 and 48)  Alpine would have the Court believe it did not keep the Northern Marsh cranberries solely because Jensen sold the same to Cliffstar under the Cliffstar Agreement.  Alpine's statement is undermined by the documentary evidence.  First, under the Cliffstar Agreement "Cliffstar agrees to purchase up to 67,516 barrels of the 2008 Crop"; not the entire crop as suggested by Alpine.  (Jt. Ex. 2 at ¶ 4, emphasis added).  Second, Alpine knew it could retain the 119,000 lbs. from the Northern Marsh cranberries, but chose not to do so.  The evidence at trial unequivocally established that Alpine had no market for selling cranberries, thereby resulting in a surplus of 2008 cranberries some three (3) years later.  (TR 311/2-14).

24.    In other words, despite disposing of 6.75 million pounds of the 15 million pounds of cranberries it contracted for in 2008, Alpine still could not sell all of its inventory.  (TR 271/5-15; 311/2-14).

25.    (¶49)  Jensen objects to Alpine's proffer of the deposition testimony referenced in paragraph 49.  The concentrate samples lack any probative measurement of acephate in the 2008 Crop.  Cliffstar admitted that the concentrate was not prepared under proper laboratory methodology, and may have been tainted as a result of Cliffstar's prior utilization of the equipment used to produce the concentrate.  Cliffstar admitted that such equipment may not have been cleaned prior to its usage.  Further, Cliffstar indicated that other fruit containing pesticides

may have been processed using the equipment prior to the production of the concentrate tested. (Bell 34/13 – 35/6).[2]

26.      (¶52)  In an effort to create an explanation for the divergent test results, Alpine directs the Court to the testimony of Mr. Paske to suggest acephate may have evaporated between the initial test in November, 2008 and the subsequent tests conducted in April of 2009. Jensen objects to Alpine's attempt to use this testimony to cover its failure to present expert testimony.  Moreover, the isolated excerpt relied upon by Alpine is neither probative nor accurate when considered in full context.

> "Q. Do you have any understanding of what acephate stability is in freezer conditions?
>
> A. I do not.

(TR 233/21-234/8)

> Q. Do you know if acephate residue can evaporate off of a cranberry that is frozen?
>
> A. Yes, it can.
>
> Q. Do you know how long it would take for acephate residue to evaporate off a frozen cranberry?
>
> A. I don't know, no.
>
> Q. Do you know if acephate residue can evaporate off a cranberry that has been frozen and then that you had?
>
> A. Yes, it could.
>
> Q. I'm just trying to clear that up. Do you know if acephate residue can evaporate off a cranberry that is not frozen?
>
> A. Yes, it could."

---

[2] Covance representatives testified the manner in which the concentrate sample was produced, and the cleanliness of the equipment used to produce it, could affect the results of testing on said concentrate thereby eviscerating its probative value.  (TR 246/18-23).

(TR 233/21-234/8)

\* \* \*

Q. So it is your understanding that in order for a pesticide to evaporate or -- I'm sorry. Strike that. Is it your understanding that in order for acephate to evaporate in a freezer that the freezer has to be a particular temperature?

A. Yes, or it needs to be exposed to that environment for a long enough period of time.

Q. And what temperature would acephate evaporate off the cranberry crop?

A. I'm not certain.

Q. But you believe at some temperature it will?

A. Yes.

Q. And you said that if the temperature was low enough, is that correct?

A. That's correct.

(TR 242/5-18).

\* \* \*

Q. Mr. Paske, are you familiar with how pesticides are applied to cranberry crops?

A. No.

(TR 248/11-13).

27.    (¶¶52-53)  Alpine offered no expert testimony, and Paske's limited testimony is no substitute for the requisite expert testimony on the science of pesticide evaporation.  Paske was neither identified as an expert, nor was Paske qualified as an expert.  Indeed, the record is devoid of the critical scientific facts as to the temperature at which acephate may evaporate (assuming that it can), or the length of time required for any such evaporation to occur.

28.    (¶¶52-53) Alpine offered no expert testimony as to why the trier of fact should

ignore or discount the results of twelve (12) tests undisputedly taken from the 2008 Crop which

tested under tolerance and are far more probative than Alpine's unwitnessed samples.

29.    (¶¶56-58) Alpine's self-serving suggestion that over-tolerance cranberries can be

processed and sold as concentrate is without any evidentiary support.  In fact, the Court noted

Smith's deposition testimony proffered on that issue was admissible only for state of mind

purposes; not for the truth of such proposition (TR 328/16 – 329/3).  In contrast, Smith admitted

he knew of <u>no</u> regulation that permitted a juicer to use a crop that was over tolerance for

acephate.  (TR 329/20-22).

30.    (¶¶56-58) The testimony of Kevin Sanvidge, Cliffstar's head of quality control

(TR 214) makes clear there is no separate and distinct tolerance level for concentrate.  Mr.

Sanvidge testified unequivocally:

> Q. Are you aware of any instance where a cranberry crop that is
> over tolerance for pesticide can be used in production?
>
> A. No.

(TR 216/6-8).

31.    (¶58) Mr. Sanvidge testified unequivocally that the entire 2008 Crop was

processed for products for human consumption.

> Q. Has all of the 2008 crop been used in production?
>
> A. Yes.
>
> Q. And what was it used in?
>
> Q. The manufacturing of cranberry juice.

                                    *   *   *

> Q. But as we sit here today, the entire 2008 crop has been used in
> production?

A. Yes.

Q. That includes any portion of the crop that any party is contesting title to?

A. Yes.

Q. And all of the crop was used in products for human consumption, is that correct?

A. Yes.

(TR 215/16 – 216/4).

32.    (¶58)  Smith provided evasive testimony during his deposition when confronted with the question of Alpine's sale of purportedly adulterated cranberries to Cliffstar.  (TR 283/23-284/9).  However, Smith was unable to identify any products other than juice produced by Cliffstar.  *Id.*  If Alpine's "over tolerance" theory is to be believed, Alpine's sale to Cliffstar was tantamount to the commission of a federal crime.  (See ¶22, *infra.*).

### III.    JENSEN'S RESPONSE TO ALPINE'S PROPOSED CONCLUSIONS OF LAW

**A.    Adverse Inference.**

1.    As Judge Learned Hand aptly explained "the deposition has always been, and still is, treated as a substitute, a second best, not to be used when the original is at hand."  *Napier v. Bossard*, 102 F.2d 467, 469 (2d Cir. 1939).  Undoubtedly, live testimony is preferred to deposition testimony.  See e.g., *Arnstein v. Porter*, 154 F.2d 464 (holding the right to use deposition testimony for limited purposes at trial does not supplant the right to call and examine an adverse party when that party is available).  And yet, Smith's live testimony was strategically substituted for his deposition testimony at trial.

2.    "A missing witness charge permitting the jury to infer that the testimony of an unproduced witness would have favored one party is appropriate if the production of the witness

'is peculiarly within [the] power' of the other party." *U.S. v. Rabbani*, 382 Fed. Appx. 39, at *41

(2d Cir. 2010) (quoting  *States v. Nichols*, 912 F.2d 598, 601 (2d Cir. 1990)).  These inferences

are equally permissible in bench trials.  *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 700

(S.D.N.Y. 2014) (citing *Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011*); In re Navon*, 364

B.R. 850, 853-54 (D. Conn. 2007).  Where one party alone could produce a material witness but

fails to do so, an inference that the witness's testimony would favor the adverse party is

appropriate.  *Id.*  Such an inference is available when the non-testifying party is closely allied

with or related to a party, such as an employee.  *Id.*

      3.      To determine if a witness is peculiarly within the power of one party, a court must

consider whether the witness is available to the party seeking the adverse inference.  *Id.* at 701.

The availability of a witness depends on "all the facts and circumstances bearing upon the

witness's relation to the parties."  *Rabbani*, 382 Fed. Appx. at *42. (quoting *U.S. v. Torres*, 845

F.2d 1165, 1170 (2d Cir. 1988)).  If a witness is available to both parties, an adverse inference

may be drawn against both or neither.  *Chevron*, 974 F. Supp.2d at 700 (citations omitted).  Even

if a witness is available to both parties, an adverse inference is still warranted when "there is a

likelihood of bias on the part of the person not called as a witness in favor of one party, for then

that person is not, in a true sense, 'equally available' to both parties; and, except in unusual

circumstances, a party's employees come within that category."  *U.S. v. Beekman*, 155 F.2d 580,

584 (2d Cir. 1946).

      4.      "As for the weight to be accorded to adverse inferences, the district court should

be mindful of Justice Brandeis' classic admonition: 'Silence is often evidence of the most

persuasive character.'"  *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997) (quoting

*United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54, 44 S.Ct. 54, 56, 68 L.Ed. 221

(1923), quoted with approval in *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558 (1976)).

5.      The district court in *In Re Navon* upheld an adverse inference that a bankruptcy court made against a debtor when the debtor failed to testify or present documentary evidence. *In Re Navon*, 364 B.R. 580.  The district court found that the adverse inference was supported by the fact that:  (1) the debtor was available to testify; (2) debtor testified in the state within the preceding year; (3) debtor's counsel included debtor's name on a list of witnesses he intended to call at a hearing and counsel never removed debtor's name from the list; (4) and the debtor had the best evidence concerning the issue of whether he owned the property subject to dispute.  *Id.* On these facts, the district court determined that the bankruptcy court's inference adverse to debtor was not clearly erroneous.  *Id.*

6.      Alpine has peculiar power and control over Smith, and could have easily produced him to testify at trial.  Smith is unavailable to Jensen because he is beyond the Court's subpoena power.  However, the evidence in this case indicates that Smith remains an owner and manager of Alpine.  Given that Moody, a fellow owner and manager of Alpine, was present in court for the trial, it is logical that Smith could have been present to testify as well.  Moreover, the record before this Court is devoid of any showing that Smith's unavailability under Rule 32 was a result of any factor other than Alpine's fear of exposing him to cross-examination and to the Court's scrutiny.

7.      In fact, similar to *In re Navon,* Smith was listed on Alpine's Witness List. [Docket 194].  "Mr. Smith **will** be called live at the time of trial, but Alpine reserves the right to call him by deposition testimony should circumstances dictate.  Alpine expects Mr. Smith's testimony will last four hours." [Dkt. 194] (emphasis added).  Likewise, Alpine's counsel never sought to

remove Smith from its witness list. Rather, Alpine's pretrial brief reaffirmed that "[b]ased on our discussion with Jensen's counsel, we believe Gary Jensen and Jonathan Smith will both appear in person at trial. [Dkt. 271].

8.     Conveniently, it wasn't until days before trial that Smith's absence at trial was conveyed to this Court. Smith's absence was explained in no precise terms, nor based on any undue hardship to him. Alpine's counsel reported, "[i]t turns out that Jonathan Smith, the **primary** deponent and businessman for Alpine in this case, is not going to be available" despite representations made to counsel for Jensen one or two days prior, that Smith would be available. (TR 5/2-4) (emphasis added). Jensen's counsel explained that "in conversations with [Alpine's counsel] **over the last day or two** there was an indication that Mr. Smith could be available on Friday." (TR 6/13-18) (emphasis added). Smith's sudden absence stands in stark contrast to Alpine's witness list, pretrial brief, and representations it made to Jensen.

9.     The parties agreement regarding the admissibility of deposition testimony in lieu of live testimony does not insulate Alpine from an adverse inference regarding Smith's failure to appear at trial. The fact that Alpine invoked its right to use Smith's deposition at trial in lieu of Smith appearing in person does not entitle it to protection from an adverse inference any more than a civil litigant's invocation of the Fifth Amendment entitles him to protection from an adverse inference drawn from the failure to testify. *LiButti*, 107 F.3d at 121.

10.     Smith was expected to testify about "Alpine's business, Alpine's communications with Jensen Cranberry Bogs, Inc. [...], the Jensen-Alpine Contract, background between the parties, the pesticide testing levels, production of cranberries, communications with Cliffstar Corporation [...], and Jensen's and Alpine's sale and or transfer of the 2008 Crop to Cliffstar." [Docket 194]. Smith's absence from trial exposes Alpine to an adverse inference that had Smith

- 15 -

testified, his testimony would have been detrimental and/or favorable to Jensen on critical issues such as timely notice, and his understanding and approval of Jensen's application of pesticides to the 2008 Crop.

**B.     Alpine's Breach of Warranty Claim Fails.**

11.     (¶4-5)  Alpine, in tacit recognition of the infirmities of its "revocation" theory, changes tact and places at the forefront its purported claim for breach of warranty.  However, Alpine's breach of warranty claim also fails as the result of Alpine's unreasonable delay.  Similar to the requirements of revocation, a prerequisite of a claim arising from an alleged breach of warranty requires notification by the buyer to the seller of such breach in a "reasonable time", and if such notice is not provided, the buyer is barred from any remedy.  WSA 402.607(3)(a).  As noted by the official commentary, the purpose of the rule is to defeat commercial bad faith.  If the seller is notified of a breach within a reasonable time, the seller then has the opportunity to ascertain for themselves the nature and extent of the breach by taking advantage of UCC §2-515, which gives the seller, the right to inspect, test and sample the goods for the purposes of ascertaining the facts and preserving evidence.  Uniform Commercial Official Comment 4, WSA 402.607; Uniform Commercial Code Official Comment WSA 402.515.

12.     (¶4-5)  Here, Alpine actually argues to the Court that the delay between delivery and April, 2009 makes suspect Jensen's eventual pesticide testing on the 2008 Crop.  (See, Dkt. 275 at p. 21 ¶5, "The only test result closest to delivery of the 2008 Crop – the November 24, 2008 Covance report – shows that the acephate levels were 1.489 ppb, almost three times the federal tolerance level.)  By Alpine's own argument, Alpine acknowledges its delay prejudiced Jensen's right to inspect, test and preserve evidence.  Remarkably, Alpine seeks to "whipsaw" Jensen by first delaying its notice for nearly five months, and then asserting its initial test is

deserving of more weight then the subsequent fourteen (14) tests which reveal the 2008 Crop to be under tolerance. Alpine's argument falls squarely within the parameters of commercial bad faith. See, *Wilson v. Tuxen,* 312 Wis.2 705, 731, *reasonable notice is intended to "permit the seller to investigate the claim while the facts are fresh..."* (internal citations omitted).

13.     (¶4-5)  Further, Alpine's conclusory assertion that the proximity of testing somehow impacts the weight or reliability of the testing must be rejected out of hand as it is not supported by a shred of evidence. To make such assertion, Alpine could only do so with expert testimony. Alpine, for whatever reasons in charting its course at trial, elected to proceed at trial without expert testimony. Opinion testimony based on scientific, technical or other specialized knowledge must be presented as expert testimony pursuant to F.R.E. 702.

14.     (¶4-5)  Either way, the Court is left to conclude that Alpine failed to give timely notice of the alleged breach of warranty and as such, Alpine is barred from any remedy under Wisconsin law. WSA 402.607.

15.     Alpine cannot recover under a breach of warranty claim for two additional reasons. First, under WSA 402.607, a buyer is required to "pay at the contract rate for any goods accepted", a showing which Alpine cannot make. Alpine failed to pay for the entire 2008 Crop despite its acceptance of the entire crop in October, 2008.

16.     Second, Alpine has failed to establish damages resulting from Jensen's purported breach of warranty. In pertinent part, WSA 402.714(2) provides:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

- 17 -

17.    Alpine presented no evidence to support its claim that the purported breach of warranty caused the price differential between the price as warranted, and the price Alpine received from Cliffstar ($62 per barrel).  The only evidence presented at trial established that the reduced price had nothing to do with any "over tolerance issue", but rather, unrelated market conditions. (Jt. Ex. 2 at Addendum A, ¶4; TR 45/19-46/1; TR 79/14-81/10; Sanvidge 109/11-15).  To satisfy its burden of proof Alpine must establish that its loss was due to the alleged breach of warranty.  *Maslow Cooperage Corp. v. Lake Weeks Pickle Co.*, 270 Wis. 179, 191 (Wisconsin 1955).

18.    Additionally, Apline has provided no evidence as to what the value of the 2008 Crop, as accepted, was <u>at the time of delivery.</u>  Such evidence is essential in order to establish any damage.  See, *Mayberry v. Volkswagen of America, Inc.*, 271 Wis.2d 258, 264 (Ct. of App. of Wis. 2004) *"the time and place of acceptance defines the temporal moment when we consider both the value of the goods accepted and the value they would have had if they had been as warranted.... Considering the market or trade-in value for [such] measure is inappropriate here because the trade-in did not occur at the time and place of acceptance."* (Internal citations omitted).

**C.    Alpine's Revocation Claim Fails.**

19.    (¶6-7)  Alpine in arguing its case for revocation, fails to acknowledge or address the nearly three month delay from its receipt of the test results to its advising Jensen of the purported non-conformance.  Alpine misplaces its reliance on *Badger Produce Company, Inc. v. Prailood Foods International, Inc.*, 387 N.W.2d 98 (Wis. App. 2011) in suggesting a delay of 49 days in revoking acceptance was reasonable with respect to frozen crabs.  Alpine fails to acknowledge that it did not provide notice to Jensen within 49 days of delivery of the 2008 Crop.

Rather, Alpine failed to notify Jensen of any purported issue for nearly <u>five</u> months following delivery of the 2008 Crop.

      20.     (¶6-7)  As noted in this Court's prior decision, Alpine is charged with knowledge of the results of the initial test on December 4, 2008 regardless of whether Alpine reviewed those tests or simply filed them away.  (Dkt. 135 at p. 15).  Had Alpine reviewed those tests and reported the same to Jensen, Jensen would have no doubt proceeded with its own testing at that time thereby eliminating from Alpine's arsenal, the argument that Jensen's tests are less reliable than Alpine's initial test.

**D.**      **Damages.**

      21.     (¶11)  Alpine, without any discussion on the appropriate measure of damages under Wisconsin law, contends it is entitled to return of its $1.5 million dollar payment to Jensen less the amount paid into Court by Cliffstar.  Alpine's failure to address the appropriate measure of damages under Wisconsin law is telling.  Under Wisconsin law, the burden of proof to establish damages rests on the party claiming damages and must be proven with reasonable certainty.  An award of damages cannot be based on conjecture.  *Maslow* supra.  The correct measure of damages on a claim for breach of warranty is the difference between the contract price and the actual value of the goods at the time of delivery.  *Id.* at 190; WSA 402.714(2).  As previously stated, Alpine offered <u>no</u> evidence as to the value of the 2008 Crop at the time of delivery.

**E.**      **Adulteration.**

      22.     Notably, Alpine makes no reference to 21 U.S.C. §§331(a) and 333 in its proposed findings.  However, at ¶58 of its Proposed Findings of Fact, Alpine implicitly acknowledges the predicament in which it finds itself.  Alpine, by suggesting a lack of evidence

of any sale by Cliffstar, ignores the express statutory language which prohibits "the introduction into interstate commerce of any food… that is adulterated…." 21 U.S.C. §331(a).  A raw food that does not comply with tolerance levels, as defined by 21 U.S.C. §342(a)(2)(B) falls squarely within the meaning of "adulterated".  Alpine's use of a portion of the 2008 Crop (TR 256/7-15) and its transfer of the remainder of the 2008 Crop to Cliffstar (TR 215/10-216/4) is tantamount to its admission that the 2008 Crop was <u>not</u> adulterated.  Otherwise, Alpine would be admitting to its commission of a crime as it is not the sale of a final product, but the introduction into interstate commerce of an adulterated food that triggers criminal culpability.

**F.      Attorneys' Fees.**

23.      (¶11)  Alpine's request for an award of attorneys' fees under Section 7 of the Alpine Contract is without merit.[3]  As a general rule, in the absence of any contractual or statutory provision, attorney's fees and expenses incurred by a prevailing party on a breach of contract claim between the parties to the contract, aside from statutory court costs and fees, are not recoverable as an item of damages.  *City of Cedarburg Light & Water Comm'n v. Glens Falls Ins. Co.*, 42 Wis.2d 120, 124-25, 166 N.W.2d 165, 167 (1969), citing, 22 Am.Jur.2d Damages, § 165 (1965); *Baker v. Northwestern Nat. Casualty Co.* (1965), 26 Wis.2d 306, 132 N.W.2d 493.

24.      Section 7 of the Alpine Contract includes no express language that warrants applying the indemnity provision to a breach of contract claim between the parties. The court in *Sarama v. Drew* confronted this issue. *Sarama v. Drew*, 217 Wis.2d 291, 1998 WL 61011, at *3

---

[3] Notably, under Alpine's interpretation, if adopted by the Court, Jensen would be entitled to an award of attorney's fees under Section 7(a) should Jensen prevail on its claims.  However, Jensen disagrees with Alpine's proffered interpretation of Section 7.

(Wis. Ct. App. 1998)[4]. In *Sarama*, plaintiff sued defendant for attorney's fees under an indemnity agreement between the parties over the sale of a condominium unit. *Id.* at *1. In rejecting plaintiff's request for indemnification for attorney's fees, the court explained:

> The Drew's hold harmless agreement indemnified the Saramas for costs and expenses growing out of [an action brought by a third party]. This was not a sufficiently specific provision to effect an indemnification of the Saramas' attorney fees in a Drews-Saramas lawsuit.
>
> *Id.* at *3.

The *Sarama* court elaborated that the American rule prohibits an award of attorney's fees unless specifically and unambiguously provided for in a contract or statute. *Id.* (citing *Hunzinger Const. Co. v. Granite Resources*, 196 Wis.2d 327, 338-340 (Wis. Ct. App. 1995) (rejecting plaintiff's indemnification claim for attorney's fees because plaintiff "is not seeking to recover litigation expenses it has incurred in a dispute with a third party.")). The court concluded that if the parties wanted indemnification for attorney's fees, "they needed to include a direct reference in the hold harmless agreement to attorney fees in a Drews-Saramas lawsuit or some other equally clear reference." *Id.* Wisconsin law is consistent with New York law on this point. The New York Court of Appeals was confronted with the identical issue in the case of *Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 548 N.E.2d 903, 549 N.Y.S.2d 365 (1989). The contract in *Hooper* obligated the defendant to "indemnify and hold harmless [plaintiff]... from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees" arising out of breach of warranty claims, the performance of services, and infringement of patents, copyrights or trademarks. *Hooper*, 74 N.Y.2d at 492, 548 N.E.2d at 905, 549 N.Y.S.2d at 367. The *Hooper* court followed the well-established rule that parties are responsible for their

---

[4] *Sarama v. Drew* is an unpublished Wisconsin decision illustrative of the issue at hand, even if its precedential value is limited.

own attorneys' fees and concluded that courts "should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise." *Id.* Since the language in the contract in *Hooper* did not clearly contemplate indemnification for suits between the parties, but rather contemplated reimbursement when the indemnitee is required to pay damages on a third-party claim, the court declined to require indemnification for counsel fees. *Id.*; *see Bourne Co. v. MPL Commc'ns, Inc.*, 751 F.Supp. 55, 57 (S.D.N.Y. 1990). The same result is required here, given the absence of any express intention to shift attorneys' fees between the parties on first-party claims for breach of contract.

## IV.     CONCLUSION

Based on the foregoing and all evidence presented at trial, Jensen is entitled to judgment as against Alpine in the amount of $794,948.82 and applicable prejudgment interest, together with a directive from the Court directing the Clerk of the Court to pay out to Jensen the $990,378.18 previously paid into Court by Cliffstar and all interest accrued thereon, with such further relief the Court deems just and proper.

Dated:     Buffalo, New York
           December 22, 2015

                              Respectfully submitted,

                              GROSS, SHUMAN, BRIZDLE &
                                GILFILLAN, P.C.

                              By:  /s/ Trevor M. Torcello
                                   Trevor M. Torcello, Esq.
                                   Hugh C. Carlin, Esq.
                                   *Attorneys for Defendant*
                                   *Jensen Cranberry Bogs, Inc.*
                                   465 Main Street, Suite 600
                                   Buffalo, New York   14203
                                   Tel:   (716) 854-4300
                                   Fax:   (716) 854-2787
                                   ttorcello@gross-shuman.com
                                   hcarlin@gross-shuman.com

Doc #463913.4

- 22 -