UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CLIFFSTAR CORPORATION,                               **FINDINGS OF FACT AND**
                                                                    **CONCLUSIONS OF LAW**
                                       Plaintiff,

v.

                                                                    09-CV-00690-JJM

ALPINE FOODS, LLC,
JENSEN CRANBERRY BOGS, INC.,

                                       Defendants.
_____

        This action involves crossclaims between defendants Alpine Foods, LLC ("Alpine") and Jensen Cranberry Bogs, Inc. ("Jensen"), each alleging that the other breached a September 2008 agreement for the sale of cranberries by Jensen to Alpine. Plaintiff Cliffstar Corporation ("Cliffstar") was previously dismissed from the action. [234, 235].[1]

        Alpine and Jensen consented to proceed before me [246], and a bench trial was held on September 16-18, 2015 [262-264]. Thereafter, the parties filed proposed Findings of Fact and Conclusions of Law [274, 275], followed by replies to those submissions [276, 277]. I am now required to issue Findings of Fact and Conclusions of Law pursuant to Fed. Civ. P. ("Rule") 52.

        In doing so, I will discuss only those issues which are material to the resolution of the parties' claims. *See* Immigration and Naturalization Service v. Bagamasbad, 429 U.S. 24, 25 (1976) ("courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach"); Rule 52 Advisory Committee Notes (1946 Amendment)

---

[1]     Bracketed references are to the CM/ECF docket entries.

("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts").

"The distinction between law and fact is anything but clear-cut." 9 Moore's Federal Practice, §52.15[1] (Matthew Bender 3d ed. 2015); Pullman-Standard v. Swint, 456 U.S. 273, 288 (1982) (noting "the vexing nature of the distinction between questions of fact and questions of law"). Therefore, for purposes of appellate review, "the labels of fact and law assigned by the trial court are not controlling". City of Chicago v. M/V Morgan, 248 F.Supp.2d 759, 762 (N.D.Ill. 2003), aff'd, 375 F.3d 563 (7th Cir. 2004).

Where necessary, the following Findings of Fact ("FF") and Conclusions of Law ("CL") (bold type) are accompanied by an explanation (regular type). See Henry v. Champlain Enterprises, Inc., 445 F.3d 610, 622 (2d Cir.2006) ("Courts are not required to provide lengthy analyses in support of their . . . findings but they are required under [Rule] 52(a) to adequately explain the subsidiary facts and methodology underlying the ultimate finding").

## FINDINGS OF FACT

**FF-1: In September 2008 Alpine and Jensen entered into a Crop Purchase Agreement (the "Agreement").** Joint Evidence Submission ("EV") 001-08.

**FF-2: The Agreement was drafted by Alpine, except for one handwritten change by Jensen at page four.** TR-46, 271-72.

**FF-3: The Agreement required Alpine to pay Jensen $1.00 per pound of "marketable Quality Fruit".** EV-002, ¶3.

**FF-4: Prior to harvesting the 2008 cranberry crop, Jensen's owner, Gary Jensen, tank mixed two pesticides, acephate ("Orthene 97") and diazinon, before applying those pesticides to the crop.** Jensen's June 16, 2011 deposition testimony, EV-210. Although Mr. Jensen testified at trial that his deposition testimony was mistaken (TR-342-343), I credit his deposition testimony, as it was closer in time to the event.

**FF-5: The Orthene 97 labeling instructions prohibited tank mixing those two chemicals.** EV-262.

**FF-6: The Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §136j(a)(2)(G), states that "[i]t shall be unlawful for any person . . . to use any registered pesticide in a manner inconsistent with its labeling".**

**FF-7: Wisconsin Statutes ("Wis. Stat.") §94.70(3)(g) states that "[n]o person may . . . [u]se any pesticide in a manner inconsistent with its labeling".**

**FF-8: Under the Agreement, Jensen warranted to Alpine that the cranberries "have been grown and delivered in compliance with all federal, state and local laws".** EV-003, ¶8.

**FF-9: Between October 12 and October 27, 2008, Jensen delivered its 2008 cranberry crop (6,750,000 pounds) to Alpine.** EV-019-143; TR-103.

**FF-10: Title to the cranberries passed to Alpine at the time of delivery in October 2008.** EV-002, ¶5.

**FF-11: Upon receipt of the cranberries, Alpine had them frozen.** TR-34.

**FF-12: Alpine made periodic payments to Jensen of $600,000 in December 2008, $600,000 in January 2009, and $300,000 in February 2009.** EV-008; TR-52-53.

**FF-13: At some point in 2008, Alpine's broker, P.J. Impex, notified Alpine that Alpine's European customers would require pesticide residue reports when they purchased cranberries.** TR-263, 267.

**FF-14: On November 24, 2008 Alpine sent a sample of the 2008 Jensen crop to a testing laboratory, Covance.** TR-288-290; EV-145.

**FF-15: Covance mailed a report to Alpine on December 4, 2008, indicating that the acephate content in the Jensen crop sample was 1489 parts per billion.** EV-145.

**FF-16: Under federal law, the upper limit of acceptable tolerance for acephate content in 2008 was 500 parts per billion.** TR-37, 54-55.

**FF-17: Alpine's president, Jonathan Smith, did not read the Covance report when he received it. Instead, he instructed his assistant to place it in the file, because he considered it to be a "file stuffer".** TR-289-290.

**FF-18: On November 24, 2008 (the same date it submitted the Jensen sample to Covance), Alpine also provided Covance with a 2008 crop sample from another of its growers, Cool Mist.** EV-144.

**FF-19: On December 4, 2008 Covance issued a report indicating that the acephate content in the Cool Mist crop sample was 1413 parts per billion.** EV-144.

**FF-20: In early to mid-March 2009, Alpine notified Jensen that the acephate content in the Jensen crop was over tolerance and it could no longer use the crop.** TR-64, 71, 137.

**FF-21: On March 23, 2009 Covance issued two additional test results for samples of the 2008 Jensen crop submitted by Alpine on March 9, 2009, indicating acephate content of 1520 and 1180 parts per billion.** EV-156, 163.

**FF-22: Covance test results for six samples of the 2008 Jensen crop submitted by Jensen to Covance on April 8, 2009 showed acephate content that varied between 61 and 179 parts per billion.** Alpine's Proposed Findings of Fact and Conclusions of Law [275], p. 20 of 30, ¶46.

**FF-23: Covance test results for six samples of the 2008 Jensen crop submitted by Jensen to Covance in May 2009 showed acephate content of less than 40 to 50 parts per billion.** Alpine's Proposed Findings of Fact and Conclusions of Law [275], p. 22 of 30, ¶50.

**FF-24: Although it knew of the Covance test results for the Cool Mist sample, and did not know of any regulation allowing a juice manufacturer to use a crop that was over tolerance for a pesticide, Alpine sold the Cool Mist crop for human consumption in a juice concentrate.** TR-328-329.

**FF-25: With knowledge of the Covance test results, Alpine sold 1.5 million pounds of cranberries from the Jensen 2008 crop to Cliffstar Corporation ("Cliffstar"), a bottler of juices, for the market price of 62 cents per pound, which was the same price that Cliffstar paid its other growers for the 2008 crop.** TR-283, 284; Sanvidge deposition, p. 109.

**FF-26: After Alpine advised Jensen that it would not pay for the remainder of the 2008 crop, Jensen disclosed all of the Covance test results to Cliffstar and sold Cliffstar the remainder of its 2008 crop at a price of 62 cents per pound, for the sum of $3,464,673.** TR96-98, 104-05, EV-018.

**FF-27: Contending that Jensen breached its warranties that the 2008 crop was grown in accordance with applicable federal and state law, was fit for human consumption, and was not adulterated, Alpine seeks damages of $1,500,000 from Jensen, representing the return of the amount which it paid to Jensen under the Agreement.** Alpine's Proposed Findings of Fact and Conclusions of Law [275], pp. 25-26 of 30, ¶5.

**FF-28:  Contending that Alpine breached the Agreement by failing to make all payments required thereunder, Jensen seeks damages of $1,785,327 from Alpine, representing the Agreement price of $6,750,000 less the $1,500,000 paid to it by Alpine and the $3,464,673 paid to it by Cliffstar, together with prejudgment interest.** Jensen's Proposed Findings of Fact and Conclusions of Law [274], pp. 12-13, ¶¶84-88.

## CONCLUSIONS OF LAW

**CL-1: Wisconsin law governs this dispute.** The parties are both located in Wisconsin, the relevant transactions occurred primarily in Wisconsin, and the parties' post-trial submissions [274-277] all address Wisconsin law, including Wisconsin's Uniform Commercial Code, Wis. Stat. §401.101 *et seq. See also* Agreement, §13 (EV-005).

**CL-2: Alpine accepted the Jensen cranberries in October 2008.** "Acceptance of goods occurs when the buyer . . . [d]oes any act inconsistent with the seller's ownership". Wis. Stat.

§402.606(1)(c). Upon receipt of the cranberries from Jensen, Alpine took title to them, froze them, and began making payments in accordance with the Agreement (*see* FF-10-12).

**CL-3: In order to justifiably revoke its acceptance of the cranberries, Alpine had to "show that the goods failed to conform to the contract *and* that the nonconformity substantially impaired their value".** H.B. Fuller Co. v. Kinetic Systems, Inc., 932 F.2d 681, 687 (7th Cir. 1991) (emphasis added, applying Wisconsin law); Wis. Stat. §402.608(1).

**CL-4: "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it."** Wis. Stat. §402.608 (2).

**CL-5: Alpine has failed to prove that it revoked its acceptance of the 2008 crop within a reasonable time after it discovered or reasonably should have discovered the ground for it.**

By tank mixing Orthene 97 and diazinon, Jensen breached its warranty that the crop was grown in accordance with federal and state law. *See* FF-5-7. However, Alpine offered no evidence as to when it discovered that breach. Although it argues that Jensen "never produced the Wisconsin Label during discovery" (Alpine's Proposed Findings of Fact and Conclusions of Law [275], p. 13 of 30, ¶21), the record contains no evidence that Alpine had demanded production of this document. Nor does Alpine explain why its attorney (Robert Lash) would have asked detailed questions about tank mixing of Orthene 97 and diazinon during Gary Jensen's June 2011 deposition (EV-210) if it did not know about the prohibition against such

mixing at that time. Absent any indication as to when Alpine learned of the breach, I cannot conclude that Alpine revoked its acceptance within a reasonable time of learning of that breach.

Alpine has also failed to prove that it revoked its acceptance within a reasonable time of receiving the December 4, 2008 Covance report indicating that the 2008 crop exceeded permissible tolerances for acephate. Although Jonathan Smith claims not to have read the report when he received it, he is charged with knowledge of its contents upon receipt. *See* Burns v. Imagine Films Entertainment, Inc.*,* 165 F.R.D. 381, 390 (W.D.N.Y.1996) (Foschio, M.J.) ("if he did not read it when he received it, he . . . [is] nonetheless chargeable with knowledge of its contents as of the date of receipt").

Alpine suggests that the initial Covance report is more reliable than later reports showing acephate levels within proper tolerances because it was closer in time to the delivery of the crop. *See* Alpine's Proposed Findings of Fact and Conclusions of Law [275], p. 25 of 30, ¶5 ("[t]he only test result closest to the delivery of the 2008 Crop . . . shows that the acephate levels were 1,489 parts per billion, almost three times the federal tolerance level"); Alpine's Reply [276], p. 9 of 15, ¶20 ("[p]esticide testing performed over five and seven months after delivery of the 2008 Crop to Alpine does not reflect that the 2008 Crop was delivered in compliance with the Contract") (emphasis in original).

If that were true (and I do not conclude that it is – *see* CL-6), then Alpine's notice of revocation was unreasonably delayed, because it prejudiced Jensen by depriving it of the opportunity to conduct earlier (and presumably more reliable) testing. *See* Wilson v. Tuxen, 312 Wis. 2d 705, 731, 754 N.W.2d 220, 232 (Wis. App. 2008) ("[o]ne purpose of prompt notice is to permit the seller to investigate the claim while the facts are fresh"); Wis. Stat. §402.515(1)

("[e]ither party on reasonable notification to the other and for the purpose of ascertaining the facts and preserving evidence has the right to inspect, test and sample the goods including such of them as  may be in the possession or control of the other").

*See also* Viking Packaging Technologies, Inc. v. Vassallo Foods, Inc., 337 Wis. 2d 125, 140, 804 N.W.2d 507, 515 (Wis. App. 2011) ("[b]y retaining [the product] for three months with the knowledge of the defects, and by making payments, the buyer waived the defects") (*citing* J. B. Bradford Piano Co. v. Baal, 166 Wis. 134, 136, 164 N.W. 822, 823 (Sup. Ct. Wis. 1917)).

**CL-6: Alpine has failed to prove that the acephate levels of the 2008 crop did not conform to the requirements of the Agreement.** The Covance test results are mixed, some showing that the acephate levels of the 2008 crop exceeded acceptable tolerances, and others showing that it did not.  However, it is Alpine's burden to show that the crop did not conform to the requirements of the Agreement, and it has not offered a scientifically valid basis to support its assumption that the test results contained in the December 4, 2008 Covance report are more reliable than later test results.  Therefore, Alpine has not met its burden of proving nonconformity.  *See* 8 Cyclopedia of Federal Procedure §26:329 (3d ed. 2016) ("[i]f proven facts go no further than to give equal support to two inconsistent inferences, judgment must go against the party upon whom rests the burden of proof").

**CL-7: Even if Alpine had had proven that the 2008 crop did not conform to the requirements of the Agreement, it has failed to prove that the nonconformity substantially**

**impaired the value of the crop.** In order to revoke its acceptance, Alpine must prove not only that the crop did not conform to the requirements of the Agreement, but also that the nonconformity substantially impaired its value. Fuller, 932 F.2d at 687. However, the evidence shows that both Alpine and Jensen sold the 2008 crop to Cliffstar for 62 cents per pound, which Jonathan Smith himself characterized as the "market price" (TR283). Therefore, Alpine has likewise not met its burden of proof on this issue.

**CL-8: For the foregoing reasons (CL-3-CL-7), Alpine did not properly revoke its acceptance of the 2008 crop.**

**CL-9: "The buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."** Wis. Stat. §402.607(3)(a).

**CL-10: Having failed to show that it notified Jensen of a breach within a reasonable time after it discovered or should have discovered the breach (*see* CL-5), Alpine is barred from any remedy against Jensen.**

**CL-11: Even if it were entitled to a remedy against Jensen, Alpine is not entitled to the remedy which it seeks.** The only remedy which Alpine seeks is the return of the $1.5 million which it paid Jensen for the 2008 crop. Alpine's Proposed Findings of Fact and Conclusions of Law [275], p. 26 of 30, ¶5. However, since it accepted Jensen's 2008 crop, has not properly

revoked its acceptance, and has not shown that the crop had no value whatsoever (having sold its share to Cliffstar for 62 cents per pound), Alpine is not entitled to this relief.  *See* 4A Lawrence's Anderson on the Uniform Commercial Code (3d ed.), 2-714:120 ("[t]he buyer cannot recover the purchase price if the buyer has accepted the goods, unless it is established that the goods had no value"); Michiana Mack, Inc. v. Allendale Rural Fire Protection District, 428 N.E.2d 1367, 1372 (Ind. Ct. App. 1981) ("[t]he remedy of recapture of the purchase price is clearly dependent upon the buyer's rejection or revocation of the goods").

**CL-12: Alpine "must pay at the contract rate for any goods accepted".**  Wis. Stat. §402.607(1).

**CL-13: It is Alpine's burden to prove that Jensen did not provide it with marketable quality cranberries.** Alpine argues that "Jensen has not provided evidence that any of the 2008 Crop constituted 'Quality Fruit' when delivered to Alpine."  Alpine's Proposed Findings of Fact and Conclusions of Law [275], p. 29 of 30, ¶12.  Alpine misplaces the burden of proof: since Alpine accepted the cranberries (and did not properly revoke that acceptance), it is not Jensen's burden to prove that the cranberries complied with the Agreement; instead, it is Alpine's burden to prove that they did not.  *See* Wis. Stat. §402.607(4) ("[t]he burden is on the buyer to establish any breach with respect to goods accepted").

> "Once the seller proves the contract to supply the buyer with goods, delivery of those goods to their destination, acceptance by the buyer, and payment of a part of the contract price, the burden shifts to the buyer to prove any pertinent deviation with respect to the quality of

the goods from the specified standard." 77A C.J.S. Sales §567. *See also* Central Soya Co. Inc. v. Epstein Fisheries, Inc., 676 F.2d 939, 944 (7th Cir. 1982) ([Epstein Fisheries] "argues that Central Soya failed to make out even a prima facie case that Aquarium Farms owed it money, because Central Soya did not plead or prove that it performed its part of the bargain by selling catfish feed that did what Central Soya had represented it would do. We disagree that this was part of Central Soya's burden of pleading or proof. The feed was accepted by Aquarium Farms . . . and while Aquarium Farms could still show that Central Soya had breached its contract, thereby excusing Aquarium Farms from having to pay for the feed it had accepted, the burden of proving a breach was on Aquarium Farms").

**CL-14: Alpine has not met that burden.** The Agreement entitles Jensen to payment of $1.00 per pound of "*marketable* Quality Fruit", not "Quality Fruit". EV002, ¶3 (emphasis added). Alpine argues that the word "'[m]arketable', although undefined under the Contract, is understood as meaning '[o]f commercially acceptable quality; fit for sale and in demand by buyers'". Alpine's Reply [276], p. 11 of 15, ¶2 (*quoting* Black's Law Dictionary (10th ed. 2014)). Since both Alpine and Jensen were able to sell the 2008 crop to Cliffstar, it was of "marketable" quality - or, at a minimum, Alpine has not proven that it was not.

Moreover, if there were any ambiguity as to the meaning of "marketable quality fruit", that ambiguity would have to be resolved against Alpine, which drafted the language. *See* North Gate Corp. v. National Food Stores, Inc., 30 Wis. 2d 317, 322, 140 N.W.2d 744, 747 (Sup. Ct. Wis. 1966) ("[w]here various meanings can be given a term, the term is to be strictly

construed against the draftsman of the contract"). Therefore, Alpine has not proven that Jensen is not entitled to payment of $1.00 per pound for the 2008 crop.

**CL-15: Jensen's claim is not barred by paragraph 4 of the Agreement.** Finally, Alpine argues that "Jensen never notified Alpine in writing that Alpine breached the Contract, pursuant to paragraph 4 of the Contract". Alpine's Proposed Findings of Fact and Conclusions of Law [275], p. 29 of 30, ¶12.  However, such notice is required only in order to give Jensen "the option to void [the] agreement" (EV-002, ¶4), a remedy which Jensen does not seek in this case.

**CL-16: For the reasons discussed, Jensen is entitled to judgment against Alpine in the amount of $1,785,327, representing the contract price ($6,750,000) less amounts already paid to it by Alpine ($1,500,000) and Cliffstar ($3,464,673), and Alpine's claims against Jensen should be dismissed.**

**CL-17: The funds previously deposited by Cliffstar should be paid to Jensen and credited toward the judgment.** On August 14, 2009 Cliffstar deposited with the court the sum of $990,378.18 pursuant to Fed. R. Civ. P. 67. *See* [4] and August 14, 2009 clerk's notation.  My July 18, 2012 Report and Recommendation [135] (subsequently adopted by Judge Arcara [162]), determined only that as between Alpine and Jensen, Alpine was entitled to payment of those funds from Cliffstar. It did not resolve the claims asserted between Alpine and Jensen, which I have now decided.

**CL-18: Jensen's request for pre-judgment interest is denied.** Jensen requests "applicable pre-judgment interest in accordance with [Wis. Stat. §] 814.04(4)". Jensen's Proposed Findings of Fact and Conclusions of Law [274], p. 19 of 21, ¶25. However, that statute provides only for interest "from the time of . . . decision . . . until judgment is entered", which in this case would be *de minimis*.

## CONCLUSION

Based upon these Findings of Fact and Conclusions of Law, the clerk of the court is hereby directed to enter final judgment in favor of Jensen against Alpine in the amount of $1,785,327 and dismissing Alpine's claims against Jensen. The $990,378.18 previously deposited with this court by Cliffstar, together with any interest accrued thereon, should be paid as directed by counsel for Jensen and credited toward the judgment. Once that payment is made, the clerk should close the case.

**SO ORDERED.**

Dated:   May 10, 2016

>                     /s/ Jeremiah J. McCarthy
>                     Jeremiah J. McCarthy
>                     United States Magistrate Judge